**ST. BERNARD HOSPITAL,
Plaintiff-Appellant,**

v.

**HOSPITAL SERVICE ASSOCIATION
OF NEW ORLEANS, INC.,
Defendant-Appellee,**

**American Hospital Association,
Defendant.**

No. 77–3457.

United States Court of Appeals,
Fifth Circuit.

June 13, 1980.

Jerald N. Andry, Gilbert V. Andry, III, Gibson Tucker, Jr., New Orleans, La., for plaintiff-appellant.

Jones, Walker, Waechter, Poitevent, Carrere & Denege, Charles W. Lane, III, New Orleans, La., for defendant-appellee.

Before TUTTLE, GOLDBERG and RANDALL, Circuit Judges.

GOLDBERG, Circuit Judge:

This case comes before this court for the second time. In its first appearance, we reversed the district court's dismissal of the complaint for lack of jurisdiction. *See St. Bernard General Hospital, Inc. v. Hospital Service Association of New Orleans, Inc.*, 510 F.2d 1121 (5th Cir. 1975). In this second appeal, the case reaches us from the district court's dismissal of the complaint on the grounds that the activity at issue is exempt from antitrust scrutiny by virtue of the McCarran-Ferguson Act ("the Act"), 15 U.S.C.A. §§ 1011–1015 (West 1976). Again, we must reverse.

We find no need to rewrite the facts exhaustively detailed in our prior opinion:

"The facts necessary to our decision were well stated by the district court in an unpublished opinion, from which we generously borrow for purposes of our statement of the case. The plaintiff, St. Bernard General Hospital, Inc. ('St. Bernard'), instituted this suit as a class action to recover treble damages for alleged violations of § 1 of the Sherman Act, 15 U.S.C. § 1. The defendant, Hospital Service Association of New Orleans, Inc., ('Hospital Service'), is a nonprofit mutual insurance association established to provide payment in favor of subscribers for the expense of complete hospital care. Hospital Service obtained a license to use the trade name 'Blue Cross' in order to sell hospitalization insurance under the Blue Cross plan in the parishes of Orleans, Jefferson, St. Charles, Plaquemine, and St. Bernard. The licensor, American Hospital Association, was originally named a defendant but was later dismissed. No appeal was taken from the order dismissing American Hospital Association.

"Very basically, the Blue Cross plan involves group pre-payment of hospital charges to Hospital Service with a reciprocal agreement by member hospitals to render medical services to subscribing insureds. The member hospitals are compensated by Hospital Service for the medical assistance they provide to subscribers. The universe of eligible subscribers includes not only residents of the five local parishes, but also any Blue Cross insured who holds a policy issued by another licensee of American Hospital Association. Thus, it can and does occur that a New York resident may receive treatment in a New Orleans member hospital pursuant to a Blue Cross policy issued by a New York licensee. Conversely, a New Orleans subscriber with Hospital Service is eligible for insured treatment in a New York member hospital. These non-

resident claims and charges are settled through a clearing house process which is utilized by the various plans across the country on a monthly collection basis. If a subscriber is treated at a non-member hospital, Hospital Service will make the reimbursement specified by the subscriber's policy to the insured or to the non-member hospital, if the insured has executed an assignment. The subscriber's coverage, however, is less comprehensive when a non-member hospital performs treatment.

"Hospital Service originally consisted of the Touro Infirmary, the Southern Baptist Hospital, the Mercy Hospital, and the Hotel Dieu. In the health insurance trade these are known as 'participating' hospitals, and they are so termed in their contracts with Hospital Service. Today there are other 'participating' hospitals in the greater New Orleans area: the Ear, Eye, Nose and Throat Hospital, the Flint-Goodridge Hospital, the Oschner Foundation, the Sara Mayo Hospital, and the West Jefferson Hospital. In order to acquire 'participating' status a hospital must meet several requisites: it must be accredited, it must be operated on a non-profit basis, and it must enter into a particular kind of contract with Hospital Service. The contract requires the hospital to render medical services to subscribing insureds and entitles it to compensation from Hospital Service for the necessary and proper charges billed to the insured. In return, the 'participating' hospital agrees to bear a portion of the expense of underwriting Hospital Service if the association becomes insolvent or its reserves become inadequate. The 'participating' hospitals do not exist entirely at the mercy of events, however, for each is afforded two seats on Hospital Service's Board of Managers, and each is entitled to vote for remaining managers who are elected at large.

"Hospitals like the plaintiff and its fellow class members, which operate for profit, may also become members of Hospital Service. They do so by signing a contract under which they are known as 'contracting' hospitals. Presently there are ten such 'contracting' hospitals, including St. Bernard, in the New Orleans area. These members have no voting rights in the election of Hospital Service's management. On the other hand, they have no obligation to underwrite the association in case of insolvency or depleted reserves.

"This lawsuit revolves around the contractual provisions between the for-profit hospitals and Hospital Service as those provisions detail the manner in which a 'contracting' hospital is compensated for Blue Cross-insured treatment. The contracts provide that Hospital Service will reimburse 100% of the charges billed to the subscriber. Such reimbursement, however, may not exceed the average per diem payment or the average per case payment made to 'participating'—i. e., non-profit—hospitals. Thus, the parties stipulate that for-profit hospitals like the plaintiff have been and will be required in various years to rebate to Hospital Service amounts collected from the association in excess of the average wholesale cost of services rendered at non-profit hospitals.

"In its complaint, plaintiff alleged that these required rebates are fixed arbitrarily by the defendant and the 'participating' members; that this so-called 'premium to do business' with the defendant constitutes the product of an unlawful agreement in restraint of interstate commerce; and that the contractual scheme has injured plaintiff and its fellow for-profit hospitals by forcing them either to forfeit all profit on Blue Cross business and at times incur losses, or else pass the amount of the rebate on to the insured patient, which presumably would encourage Blue Cross subscribers to utilize only the 'participating' non-profit hospitals. In its brief, plaintiff alleges more specifically a group boycott by the defendant and 'participating' hospitals, which plaintiff asserts is a per se violation of Sherman Act, § 1." *Id.* at 1121–23 (footnote omitted).

The district court held that the contract between Hospital Service and St. Bernard is part of the "business of insurance" and is regulated by state law within the meaning of section 2(b) of the Act, 15 U.S.C.A.

§§ 1012(b) (West 1976),[1] and hence is immune from application of the antitrust laws. In light of the Supreme Court's recent pronouncements in *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), we hold that this contract is not part of the "business of insurance" as contemplated by the Act.

## I.

In *Royal Drug* the Supreme Court was faced with the question whether pharmacy agreements offered by the defendant, Blue Shield, to pharmacies were the "business of insurance" under section 2(b) of the Act. Under these agreements, the contracting pharmacy was obligated to dispense to Blue Shield policyholders prescription drugs for the price of two dollars. In return, Blue Shield agreed to reimburse the pharmacy for the pharmacy's cost of obtaining the prescribed drug.

The Court concluded that "[t]he primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk." *Id.* at 1073. In holding that the pharmacy agreements did not contain either of these indispensible elements, the Court rejected the following argument of the petitioning defendants:

"In *Securities and Exchange Commission v. Variable Annuity Life Insurance Co.*, 359 U.S. 65, 73, 79 S.Ct. 618, 623, 3 L.Ed.2d 640 (1959), the 'earmark' of insurance was described as the 'underwriting of risk' in exchange for a premium. Here the risk insured against is the possibility that, during the term of the policy, the insured may suffer a financial loss arising from the purchase of prescription drugs, or that he may be financially unable to purchase such drugs. In consider-

ation of the premium, Blue Shield assumes this risk by agreeing with its insureds to contract with Participating Pharmacies to furnish the needed drugs and to reimburse the Pharmacies for each prescription filled for the insured. In short, each of the fundamental elements of insurance is present here—the payment of a premium in exchange for a promise to indemnify the insured against losses upon the happening of a specified contingency."

*Id.* at 1074. The court found that the particular activity at question, the pharmacy agreements, did not further the risk spreading and risk underwriting elements inherent in a contract between an insured and an insurer:

The fallacy of the petitioners' position is that they confuse the obligations of Blue Shield under its insurance policies, which insure against the risk that policyholders will be unable to pay for prescription drugs during the period of coverage, and the agreements between Blue Shield and the participating pharmacies, which serve only to minimize the costs Blue Shield incurs in fulfilling its underwriting obligations. The benefit promised to Blue Shield policyholders is that their premiums will cover the cost of prescription drugs except for a $2 charge for each prescription. So long as that promise is kept, policyholders are basically unconcerned with arrangements made between Blue Shield and participating pharmacies.

The Pharmacy Agreements thus do not involve any underwriting or spreading of risk, but are merely arrangements for the purchase of goods and services by Blue Shield. By agreeing with pharmacies on the maximum prices it will pay for drugs, Blue Shield effectively reduces the total amount it must pay to its policyholders.

---

1. Section 2(b) of the Act, 15 U.S.C.A. § 1012(b) (West 1976), provides the following:

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That after June 30,

1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

The agreements thus enable Blue Shield to minimize costs and maximize profits. Such cost savings arrangements may well be sound business practice, and may well inure ultimately to the benefit of policyholders in the form of lower premiums, but they are not the "business of insurance."

*Id.* at 1074–75 (footnotes omitted).[2]

## II.

Before turning to an application of *Royal Drug* to the facts of this case, we first emphasize what we do not here decide. St. Bernard attacks its contract with Hospital Service. It does not challenge the validity of Hospital Service's policies with Hospital Service's subscribers. Thus, our opinion in no way addresses the question whether those policies are part of the "business of insurance" under section 2(b) of the Act.[3] *See id.* at 1082 n.37.

In applying *Royal Drug*, our primary difficulty in this case has been the determination of our proper focus. The Supreme Court has indicated that we must focus on the particular activity under attack and determine whether that activity constitutes the "business of insurance." Broadly conceived, the challenged activity at issue here is the procurement of medical services by Hospital Service. When the activity is thus characterized, we find it to be potentially a hybrid creature. Hospital Service's purchase of medical services from participating hospitals possibly involves the underwriting and spreading of risk,[4] while its buying of medical services from contracting hospitals like St. Bernard has no underwriting aspects. Narrowly conceived, the challenged activity becomes the procurement of medical services from outside parties, the contracting hospitals. From this perspective the activity is of a singular nature—it involves no underwriting. It is thus apparent that the nature of our focus in this case could be all important.

For two reasons we conclude that we must view the agreements with contracting hospitals apart from those with participating hospitals. First, in *Royal Drug*, the Supreme Court observed that "the statutory language in question here does not exempt the business of insurance companies from the scope of the antitrust laws. The exemption is for the 'business of insurance,' not the 'business of insurers'. . . ." *Id.* at 1073. This language indicates that discrete conduct must be examined to determine whether it is the "business of insurance," and that courts should not sweep other conduct into that examination.

Second, in *Royal Drug* there existed an alternative method to reimburse a policyholder for his claim. Instead of utilizing the services of a pharmacy which had entered into a pharmacy agreement, the insured could select a non-participating pharmacy. The insured would then be reimbursed for seventy-five percent of the difference between the prescription price and two dollars. In considering whether the pharmacy agreements were the "business of insurance," the Court did not discuss this alternative method of satisfying the claims

---

2. The Court further amplified the difference between activities which serve to underwrite and spread risk and those which function to reduce costs: "[T]here is an important distinction between risk underwriting and risk reduction. By reducing the total amount it must pay to policyholders, an insurer reduces its liability and therefore its risk. But unless there is some element of spreading risk more widely, there is no underwriting of risk." *Id.* at 1075 n.12.

3. At least one district court has distinguished *Royal Drug* and held that such policies are the "business of insurance." *See Virginia Acade-* *my of Clinical Psychologists v. Blue Shield of Virginia*, 469 F.Supp. 552 (E.D.Va.1979).

4. As we have noted, Hospital Service possibly underwrites the risks of its subscribers, and therefore its policies issued to its subscribers might constitute "the business of insurance." *See* note 3 *supra.* If such is the case, then Hospital Service's contracts with the participating hospitals also might be "the business of insurance," because the participating hospitals underwrite Hospital Service against insolvency or inadequate cash reserves. We express no opinion as to the resolution of this question.

of policyholders.[5] Instead, the Court examined only the pharmacy agreements to determine whether they involved risk underwriting or risk spreading.

■ Similarly, in this case Hospital Service pays benefits to its subscribers by two methods. First, it procures medical services by contracting with hospitals like St. Bernard. Second, it satisfies its policyholders' claims by buying the services of participating hospitals. As in *Royal Drug*, the determination whether one method of reimbursing policyholders, contracting with hospitals like St. Bernard, is the "business of insurance" should not be affected by the existence or nature of an alternative means, contracting with participating hospitals. Accordingly, we must focus only on the contract between St. Bernard and Hospital Service.

### III.

■ Our task now becomes easy, for this contract is of the same genre as the pharmacy agreements at issue in *Royal Drug*. The contract with St. Bernard does not serve the underwriting and spreading of the risks of Hospital Service's subscribers. Rather, the contract is merely an arrangement for the purchase of goods and services by Hospital Service. *See id.* at 1074. By stipulating that it will reimburse St. Bernard only to the extent that the costs of St. Bernard's services do not exceed the average costs of its members, Hospital Service does not underwrite or spread its subscribers' risks, but instead only minimizes the costs it must incur to fulfill its underwriting obligations. *See id.* The contracts are thus not the "business of insurance" within the meaning of the Act.

### IV.

Hospital Service asks us to affirm the summary judgment in its favor on the alternative ground that St. Bernard's case is insufficient. In particular, the Hospital Service points to the following colloquy between the district court and St. Bernard's attorney concerning the existence of a con-

spiracy in the plaintiff's claim under section 1 of the Sherman Act.

THE COURT: Are you alleging a conspiracy?

ST. BERNARD'S ATTORNEY: I allege that that is a fact, that is that situation exists. I don't say—I don't use the word conspiracy, I don't see anything conspiratorial about it, it's just a fact.

We sympathize with the inability of Hospital Service to divine the sufficiency of St. Bernard's claims, for it is obvious from the pleadings, the briefs, oral argument before us, and the proceedings below that there has been little proper consideration by St. Bernard of the nature of the antitrust laws. Furthermore, we, as Hospital Service, have encountered great difficulty in construing the claims of St. Bernard's pleadings. Nevertheless, the district court has never considered the alternative grounds for summary judgment, and, in view of the complex factual nature of this case, we will stay our hand. *See Liberty Glass Co. v. Allstate Insurance Co.*, 607 F.2d 135, 138 (5th Cir. 1979).

REVERSED AND REMANDED.

■

---

5. The contractual arrangement between an insurer and an insured to pay an insured's claim could be exempt under the Act since "the busi- ness of insurance relates to the contract between the insurer and the insured." *Id.* at 1075. We need not reach this issue.