Victor J. BOTTAZZI, Plaintiff-Appellee,

v.

PETROLEUM HELICOPTERS, INC., et al., Defendants-Appellees,

v.

DETROIT DIESEL ALLISON, DIVISION OF GENERAL MOTORS CORPORATION, Defendant-Appellant.

No. 80–3454.

United States Court of Appeals,
Fifth Circuit.*
Unit A

Dec. 14, 1981.

* Former Fifth Circuit case, section 9(1) of Public Law 96–452—October 14, 1980.

A. R. Christovich, Jr., New Orleans, La., for defendant-appellant.

Vance E. Ellefson, New Orleans, La., for Petroleum Helicopters, Inc.

Richard S. Vale, Metairie, La., for Employers Ins.

Bob F. Wright, Anthony D. Moroux, Lafayette, La., for Bottazzi.

Before MARKEY,** Chief Judge, and GEE and POLITZ, Circuit Judges.

GEE, Circuit Judge:

In 1977, plaintiff Victor Bottazzi was a technician who worked on offshore oil platforms. His access to these was usually by helicopter, though sometimes by crew boat. Both in June and in October of that year he was, while a passenger on such helicopters, involved in accidents, each time being rescued from the water. The details of these incidents are unnecessary to relate beyond observing that each put him in genuine peril and aroused in him a legitimate fear of death.[1] Medical testimony at a bench trial established, and the trial court found, that the two accidents, one no more than the other, combined to produce severe emotional problems for Mr. Bottazzi. This ruling and others by the court—notably its application of strict tort liability in the context of general maritime law—are drawn before us on this appeal by Detroit Diesel Allison ("DDA"), manufacturer of the engine whose failure occasioned the first accident. We give further facts in our discussion of DDA's three points for reversal.

### Consolidation

Mr. Bottazzi filed separate suits less than two months apart seeking recovery for damages resulting from each of these two accidents. Petroleum Helicopters, Inc. ("PHI"), the operator of the helicopters, was a common defendant in each suit, with other disparate parties. In each, Bottazzi claimed physiological and psychiatric damage. On his motion, the court consolidated the cases for trial. DDA complains to us of this action by the trial court, asserting the absence of any such "common question of law or fact" as Rule 42(a), Fed.R.Civ.P., requires for consolidation.

We think the consolidation ordered was within the trial court's broad discretion in such matters. As a basis for our ruling, we need seek no further than the suits' allegations regarding Mr. Bottazzi's psychological condition. Each complaint counts for psychological damage. Thus, in each case Mr. Bottazzi's mental state was a fact issue. "Mind" is a slippery concept, mental and

---

** Of the U.S. Court of Customs and Patent Appeals, sitting by designation.

1. The first involved an engine failure and fire, a loss of power, and an emergency water landing—though only minor physical injuries to Mr. Bottazzi. The second was more severe, involving an unsuccessful attempt to land on a drilling barge, an explosion, and much more serious, though still not permanent, physical injuries: broken ribs, lacerations, and sprains.

psychological states and their causes more so; but surely the psychological state of a given person at a given time is a unitary matter. We think the question of what that state is and will be, present and future, presents a sufficient common question of fact to support the consolidation of these two cases, in each of which Mr. Bottazzi's mental infirmities, if any, and their causes were at issue.

### Apportionment of Damages

■ DDA also complains about one aspect of the court's damage award: its equal division of damages for plaintiff Bottazzi's long-term psychological injury and for the special items of damage associated with that injury between the two defendants. We see no error here.

The medical and psychological evidence was clear and virtually undisputed that Mr. Bottazzi suffered a severe, long-term psychological reaction as a result of the combined effect of these two accidents. More than one expert witness testified that neither accident, standing alone, produced this effect: that it was the cumulative result of the two and that it was impossible to assign to either a proportionate degree of causation.

Reason suggests that where, as here, separate wrongful acts by different tortfeasors produce a unitary injury and where the degree of contribution of each act to that injury cannot be ascertained, an equal division of damages resulting from it is appropriate. Indeed, any other rule would deny the injured party recovery of damages clearly resulting from the combined effect of the two acts because he was unable to prove how much each one caused. Thus, the rule is to be seen as one of necessity: inferior to an allocation of damages by degree of causation where that is possible, it is a lesser evil than exonerating one or more culpable parties because the discrete degrees by which they contributed to the injury are unproved [2] or unprovable. Nor is analogous authority lacking. For example, Texas law, as we noted in *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), is to similar effect: that where several defendants' acts combine to cause harm, the burden shifts to each to show what portion he caused and, failing such a showing or showings, each is jointly and severally liable with the others for the total damages. Cf. *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132, *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980) (tort liability and damages for drug apportioned according to each manufacturers market share when degree of liability unprovable). We are satisfied that such and similar rules, though imperfectly fair to defendants, are preferable to denying to innocent, injured parties recovery of those who injured them because the degree of injury caused by each cannot be shown.

### Tort Law Proper: Sufficiency of the Evidence and Strict Liability at Sea

We now arrive at the more important and difficult questions in the case. The second accident was caused by pilot error, as the court below determined. The trial court found that error to rise to the level of negligence, for which PHI, the pilot's employer, was liable on conventional principles of respondeat superior. No complaint is made to us of these garden-variety findings. It is quite otherwise as to the court's rulings on the first accident, an under-

**2.** Here DDA, the sole appellant, made no effort to do so, contenting itself with arguing that since the second accident—which it did not cause—was the more severe, it should bear a smaller share of the burden or none of it. The argument does not lack some force but misses the main thrust of the medical testimony. This was that each accident placed Mr. Bottazzi in peril of his life, without means to extricate himself from that peril, and that it was this aspect of each that combined with that of the other to produce his psychological problems. In neither were his physical injuries either very severe or permanent. And although it is obvious that many men might have withstood this and more without receiving such damage as Mr. Bottazzi suffered, the evidence of his psychological injury is clear and undisputed in this record.

standing of which requires the statement of several additional facts.

All parties agree generally on the causes of this accident. Generally, a turbine power shaft in the helicopter engine failed in torsion, producing a loss of power and the consequent ditching of the aircraft. Specifically, the trial court found that this shaft, a hollow one, failed because corrosion on its inner surface had reduced the thickness of metal in its cross-section by about half. The corrosion was produced by a spray of oil entering through a faulty seal, oil that—under high temperature and pressure—became acidic and therefore corrosive. Thus, the seal and the manner of its failure become the focus of attention.

That "seal," if it may be so termed, was the product of an interference fit between the outer turbine shaft, which failed, and a parallel, concentric shaft lying within the hollow of the outer one. At its extremity the outer shaft necked down in its internal diameter, the inner shaft somewhat also, but to a lesser degree. The fit, or seal, in question was produced by forcing the smaller internal shaft into the narrowed internal diameter of the hollow, outer shaft, as one might force a sharpened pencil lying inside a tube of slightly larger diameter forward into a crimped-down end of that outer tube. Thus, the interference fit, like that between the outer surface of the pencil's beveled end and the inner diameter of the tube's necked-down extremity. Through a faulty seal of this sort entered the oil that caused the fatal corrosion on the housing shaft's internal surface, setting in train the events that led to Mr. Bottazzi's injuries.[3]

■ The causal train explained, we must now turn to the sufficiency of the evidence to support the trial court's assessment of liability against DDA based upon it. All evidence must, of course, be viewed in its aspect most favorable to the trial court's findings based upon it. These findings amount to ones of negligence on the part of DDA, though this is not explicitly stated, and strict liability. Since we conclude that

the evidence, so viewed, is sufficient to support the court's negligence finding, we need not consider those on strict liability—a theory not thus far accepted by us for application in maritime cases such as this.

Witnesses presented by DDA in its own defense established that there should be no oil in the inner diameter of the shaft which failed; that the whole purpose of the interference fit is to exclude it; that the only way for oil to enter there is through an improper interference fit; and that the cause of the shaft's failure was corrosion introduced by the entry of oil. They also established that several instances of such corrosion had been brought to the attention of DDA prior to the accident and that DDA knew that such a condition was dangerous. Nevertheless, DDA neither warned customers of this potential danger nor specified in its overhaul manual that a pressure test, the sole means of being sure the interference fit is correct, be conducted whenever the fit was broken and reset. This is sufficient evidence to support a conclusion that DDA was negligent. Since it is and since this suffices to support the court's judgment, we need not consider the propriety of the court's application of product liability doctrines to the maritime context.

AFFIRMED.

---

**3.** With apologies to "For want of a nail, the shoe was lost ...," a nursery rhyme apposite to the attenuated chain of causation that we view today.