**ST. BERNARD GENERAL HOSPITAL, INC., Plaintiff-Appellant,**

v.

**HOSPITAL SERVICE ASSOCIATION OF NEW ORLEANS, INC., Defendant-Appellee.**

No. 82–3055.

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1983.

Gibson Tucker, Jr., Gilbert Andry, New Orleans, La., for plaintiff-appellant.

Charles K. Reasonover, Pamela Pryor Mehle, New Orleans, La., for amicus Chalmette, etc.

John A. Stassi, II, New Orleans, La., for amicus St. Charles General.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Charles W. Lane, III, New Orleans, La., for defendant-appellee.

Before GEE, GARZA and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

St. Bernard General Hospital, Inc. (St. Bernard), a small, for-profit hospital in the New Orleans area, brought this antitrust suit, claiming restraint of trade by the Hospital Service Association of New Orleans, Inc.,[1] the area Blue Cross licensee. 15 U.S.C. §§ 1, 15. The district court ordered an involuntary dismissal at the close of the plaintiff's case, Fed.R.Civ.P. 41(b). We reverse and remand for further proceedings.

### Procedural History

This is the third appearance of this case before our Court. The case was filed originally in September, 1971. In March of 1974, the district court rendered summary judgment in favor of the Blue Cross licensee on the ground that there was no effect on interstate commerce shown in the case. This Circuit reversed and remanded, 510 F.2d 1121 (5th Cir.1975). On remand, the district court dismissed the suit on the basis of the "business of insurance" exception to the antitrust laws contained in the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015. This Court again reversed and remanded, 618 F.2d 1140 (5th Cir.1980), finding that the actions of Blue Cross at question in this case did not fall into the "business of insurance" exception.

While this case was pending, other New Orleans area hospitals filed similar antitrust claims against Blue Cross. These other cases were all consolidated for trial, and discovery was underway at the time of the second remand in this case. St. Bernard moved to consolidate this action with the other cases, but the district court denied the motion both before and at the start of St. Bernard's scheduled trial. Further, the district judge, whose docket included both this case and the other consolidated cases, applied a protective order to much of the discovery in the other cases, so that St. Bernard was not permitted to avail itself of the fruits of discovery in the other consolidated cases.

This case was set for trial on December 21, 1981. On November 4, 1981, the judge held a pretrial conference and found that St. Bernard had not yet completed its preparations for trial or located a key witness. It also had not yet fully informed its opponent of the theoretical underpinnings of its antitrust charges. The judge admonished St. Bernard to complete trial preparations or risk the consequences. The case went to trial as scheduled on December 21.

St. Bernard presented four witnesses at trial: Edmond Vallon, president of Hospital Service Association of New Orleans, Inc. (HSA) during the years in question; Dr. Emile Bertucci, Jr., the chief stockholder and medical director of the hospital; Emile Bertucci, III, an administrator in the hospital toward the end of the years in question; and, Harold Pittman, administrator of the hospital during previous years. These four witnesses testified as to the standard practices of St. Bernard and Blue Cross and the nature of the relationship between the two. No witness testified on the issue of damages, because the parties stipulated before trial that the amount at issue was $147,-610.70.

1. Hereinafter referred to as HSA or, for clari-    ty's sake, Blue Cross.

At the end of the plaintiff's case, HSA moved for an involuntary dismissal of the case, pursuant to Rule 41(b), Fed.R.Civ.P. The district court granted the motion, making the following findings:

No showing of effect on interstate commerce;

Hospital payments in the vast majority of cases would have been the same to St. Bernard regardless of the complained-of conduct, thus negating antitrust injury;

No merit to the substance of the antitrust charges.[2]

St. Bernard appeals from this dismissal. It asks, first, that we find evidence of a per se violation of section one of the Sherman Act under the evidence presented and remand for a full trial, and second, that we grant the earlier-denied motion to consolidate this case with the similar cases now preparing for trial in the same court.

### Blue Cross and the New Orleans Hospital Market

We begin by examining the structure of the New Orleans hospital market and the general applicability of the antitrust laws. Blue Cross is a major health care insurer in the country. In New Orleans, the licensee for Blue Cross insures approximately 300,000 people, which is about 38% of those with health care insurance and 30% of the general population. Blue Cross came to the New Orleans area in the 1930's in the form of a private sector, nonprofit corporation founded by four area nonprofit hospitals. These four hospitals referred to themselves as the "participating hospitals." The participating hospitals agreed to run the Blue Cross program on behalf of subscribers and to underwrite any financial shortfalls from operations. Operating surpluses, evidently, were to be rechanneled into Blue Cross programs.

Blue Cross grew and prospered in the succeeding years. Only once were the participating hospitals asked to cover an operating deficit. This was in 1937, when the four participating hospitals collectively covered a $13,000 shortfall. In most years, Blue Cross has enjoyed an operating surplus.

The present suit concerns only the years 1969 through 1972.[3] During the period relevant to this lawsuit, there were nine participating hospitals, all nonprofit facilities in the New Orleans area. The Blue Cross board of directors was composed of 31 members. Each of the nine participating hospitals appointed two representatives to the board, and the remaining thirteen at-large members were elected by the eighteen hospital representatives. In this way, the participating hospitals enjoyed effective control of the Blue Cross board, both by having a simple majority on the board and by selecting all the "outside" directors.[4]

Blue Cross sells hospitalization insurance to individuals and groups under a variety of programs. Some policies pay only basic benefits, while others provide more comprehensive coverage. The basic policies, for example, will not pay for services per-

2. In finding no merit to the substantive antitrust charges, the district court found that there was no sinister or anticompetitive motive on the part of HSA to hurt St. Bernard or impede competition. Furthermore, the court found no scintilla of evidence that there was any economic coercion on the part of HSA, either implicit or explicit. The details of the district court's substantive holdings are discussed later in this opinion.

3. St. Bernard also claims antitrust injury in the year 1966, but this claim is barred by the statute of limitations. It must also be noted that St. Bernard Hospital is no longer in business. Its successor in operations is the De La Ronde

Hospital, also a for-profit facility. The successor hospital is, unlike St. Bernard, a participating hospital in the Blue Cross organization.

4. The Blue Cross by-laws require that outside directors be subscribers or members of Blue Cross. This requirement apparently is easy to meet, since Blue Cross underwrites approximately 38% of all health insurance in the area. The record shows that many of the "outside" directors have been not only subscribers to Blue Cross, but board members of the participating hospitals as well, thus effectively strengthening the ties between the participating hospitals and Blue Cross.

formed at a hospital without some form of Blue Cross affiliation.[5]

The various Blue Cross policies do not reimburse all the area hospitals on an identical basis. Blue Cross distinguishes among three categories of hospitals for reimbursement purposes. At one extreme are the hospitals without any Blue Cross affiliation, known as the "non-affiliated hospitals." These hospitals receive less from Blue Cross under most subscriber policies than an affiliated hospital would receive for identical services. The patient typically is expected to make up the difference, making it less attractive both for the hospital and the patient for Blue Cross members to be treated in non-affiliated hospitals. Non-affiliated hospitals are not involved in the instant case.

At the opposite end of the spectrum are nine affiliated hospitals known as the "participating hospitals." These nine hospitals, which appoint representatives to the board of Blue Cross, are promised reimbursement in full for all care provided to all Blue Cross subscribers, almost without limitation. All nine are nonprofit institutions and are accredited by the Joint Commission on Accreditation of Hospitals (JCAH).

The third group is an intermediate category of affiliated hospitals called "contracting hospitals." Contracting hospitals for the most part are for-profit institutions.[6] Contracting hospitals need not be JCAH-approved. The contracting hospitals have entered into agreements with Blue Cross, stating that the hospital will provide all needed services to all Blue Cross subscribers desiring admission, without regard to the type of coverage or policy involved. Blue Cross, in return, promises to pay the hospital's usual, customary, and reasonable (UCR) charges.[7]

Unlike the arrangement with the participating hospitals, however, the agreement with the contracting hospitals sets an upper limit on the reimbursable amount. Contracting hospitals are initially paid 100% of the UCR charges, the same reimbursement that Blue Cross would make to a participating hospital. At the end of each year, however, Blue Cross makes an accounting of all hospitalization payments and may demand a partial refund from the contracting hospitals. The contracting hospital may not keep more than the average amount paid to a participating hospital under a like policy for similar illness or a comparable length of stay. Contracting hospitals whose billings do not exceed the average billings of participating hospitals (after adjusting for length of stay, diagnosis, and policy type) owe no rebate to Blue Cross. However, those hospitals whose average charges exceed those of the participating hospitals, after these adjustments, must make a refund of the excess to Blue Cross. Thus, whether a contracting hospital owes a refund to Blue Cross at the end of the year depends on whether that hospital has been able to contain costs at or beneath the average charges of the participating hospitals. There is no comparable refund requirement imposed upon a participating hospital.

During the years in question, 1969–1972, St. Bernard Hospital was one of the Blue Cross contracting hospitals. It was a for-profit facility, and was not JCAH approved (although it was fully licensed by the state). It was a 39 bed hospital affiliated with a medical clinic housed in the same building. Dr. Emile Bertucci, Jr., and his family

5. Several large employers have negotiated their own Blue Cross master policies, however, containing special provisions. Many of these large-employer policies will provide reimbursement for services performed at non-Blue Cross affiliated hospitals.

6. Until recently, only nonprofit hospitals could be "participating hospitals" within the Blue Cross system. After this suit was filed, however, Blue Cross offered participating status to additional hospitals, including St. Bernard, a for-profit, contracting hospital. The De La Ronde Hospital, the successor institution to St. Bernard, and also a for-profit facility, eventually accepted this invitation and is now a Blue Cross participating hospital. This case, however, involves years when St. Bernard was not accepted as a participating hospital.

7. Different policy types, however, provide for different repayment schedules that might affect the actual payment Blue Cross makes to the contracting hospital.

owned the stock of the hospital. Back in 1961, shortly after Dr. Bertucci bought the hospital, St. Bernard entered into its contracting hospital status with Blue Cross. The contract provided for full payment on all types of patient policies, subject to the cap of the average charges of the participating hospitals.[8] In many years, St. Bernard's Blue Cross billings were within the limit imposed, and St. Bernard owed nothing back to Blue Cross. In five of the years, however, St. Bernard exceeded the cap. The first such year was 1966, when St. Bernard refunded $843.04 to Blue Cross. The statute of limitations bars any antitrust claim for 1966. In four later years, 1969–72, St. Bernard made refunds totaling $147,610.70 to Blue Cross,[9] representing approximately 13 percent of total Blue Cross payments.[10]

It is this refund that is alleged to support the antitrust claims before us. St. Bernard urges that Blue Cross has been favoring the participating hospitals that sit on the board at the expense of St. Bernard and the other contracting hospitals. When St. Bernard entered into its agreements with Blue Cross, Blue Cross prohibited St. Bernard from joining as a participating hospital. St. Bernard claims that since Blue Cross would neither offer St. Bernard status as a participating hospital nor reimburse it equally with the participating hospitals, Blue Cross discriminated against it in violation of the antitrust laws. With this overview in mind, we turn to the substance of the antitrust claims in this case.

### Sherman Act Applicability

A. Standard of Review.

■ The question before us is not whether there was either in fact or in law an actual violation of the antitrust laws. The question is the more limited one of whether St. Bernard's evidence could support a theory of antitrust recovery if HSA fails to rebut that evidence effectively. We are asked only to decide if the district court's dismissal was proper.

The district court below dismissed this case under Fed.R.Civ.P. 41(b). Rule 41(b) allows a judge to dismiss a case with prejudice at the end of a plaintiff's evidence, if the case is being tried without a jury. In a jury trial, by contrast, the proper motion at the end of the plaintiff's case would be a motion for directed verdict, Fed.R.Civ.P. 50. The standard for granting the motion, hence our standard of review on appeal, differs slightly between the two.

On a motion for directed verdict in a jury trial, the district judge is to look at the evidence in the light most favorable to the nonmoving party, including all reasonable inferences and accepting conflicts in the evidence as favoring the nonmoving party. Only if the evidence, viewed in that light, fails to establish a legally-cognizable claim is the judge to enter a directed verdict. *Excel Handbag Co. v. Edison Bros. Stores, Inc.*, 630 F.2d 379, 384 (5th Cir.1980).

In a case tried to the court, by contrast, the judge commands the inquiries into facts as well as law. In considering a motion for involuntary dismissal under Rule 41(b), therefore, the district court is not limited to a narrow viewing of the facts, but rather must adjudge the evidence and weigh the credibility of witnesses. *Weissinger v. United States*, 423 F.2d 795, 798 (5th Cir. 1970) (en banc). The judge may use his or her skills as factfinder in ruling on the merits of the claims at the close of the

8. The full payment provision became effective on April 1, 1962. During 1961, Blue Cross paid St. Bernard only 98% of its UCR payments, and in 1960 the figure was 97%. The cap on reimbursement, based on payments to the participating hospitals, has always been in effect.

9. St. Bernard was not asked to make any Blue Cross rebate during 1967 or 1968. In 1969, it refunded $20,107.04 to Blue Cross. In 1970, it refunded $43,219.34. In 1971, the sum was $33,096.72, and in 1972, $51,187.60. The total for the years in question, 1969–1972, is $147,-610.70, as stipulated by the parties.

10. Blue Cross payments to St. Bernard, which totalled $1,133,476.63 over the four years at issue, constituted approximately one-third of St. Bernard's total income. In 1971, a typical year, 567 of the hospital's 1,588 admissions were Blue Cross cases.

plaintiff's case. This is a power denied the judge in a trial where a jury sits as ultimate factfinder.[11]

Since a Rule 41(b) motion permits a judge to consider all inferences, favorable and unfavorable, our standard of review on appeal must differ slightly from that applied to a Rule 50 directed verdict. We must consider not only if the district court erred in the law, but also whether its conclusions of fact are supported by substantial credible evidence and are not clearly erroneous. *Id.* We may not, however, substitute our interpretation of the evidence for that of the district judge. With these standards in mind, we begin by examining the conclusions of the district court.[12]

B. The District Court's Findings.

■ *1. Interstate Commerce.*—The district court found no substantial effect on interstate commerce in this case. We reverse this finding. Undisputed evidence in the record shows that St. Bernard purchased much of its supplies from out-of-state suppliers and from out-of-state manufacturers. The economic damage that St. Bernard alleges obviously affected these transactions, whether directly in terms of St. Bernard's ability to purchase supplies or indirectly in terms of its general economic strength and viability. *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (hospital's purchase of substantial percentage of supplies from out-of-state is sufficient to support antitrust jurisdiction).

■ The Sherman Act's requirement of effect on interstate commerce demands little more than a "not insubstantial" effect on commerce, *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980); *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974),

and even an indirect impact by the acts charged upon interstate commerce is not to be tolerated. The commerce requirement of antitrust jurisdiction depends on "the nature of the restraint, and its effect on interstate commerce, and not the amount of the commerce...." *United States v. Central States Theatre Corp.,* 187 F.Supp. 114, 145 (D.Neb.1960). This record establishes that interstate commerce is sufficiently affected to invoke jurisdiction under the antitrust laws. *See also St. Bernard I,* 510 F.2d 1121.

■ *2. Economic Injury.*—The district court also supported its decision to dismiss on the basis that antitrust injury was not shown. The court reasoned that the evidence showed that Blue Cross' reimbursements typically would be the same to most hospitals under the most common types of Blue Cross insurance policies. It reasoned that since the vast majority of cases would involve *no disparity in payment regardless* of the type of relationship between the treating hospital and the Blue Cross organization, St. Bernard could not have suffered antitrust injury.

The district court, however, overlooked the fact that St. Bernard had clearly shown $147,610 in rebates it made to Blue Cross, rebates it would not have had to make if it had been treated on identical terms with the participating hospitals. This figure is undisputed. Regardless of what the "majority" of the Blue Cross reimbursements might have been to St. Bernard or other hospitals, there is no doubt that St. Bernard was treated differently from the "insider" hospitals, to the amount of $147,610. Since an undisputed quantum of damage was shown, we must reverse the district court's finding that there was no disparate economic impact on St. Bernard.

*3. Other Rulings.*—The remaining portions of the district court's findings discuss

---

11. A Rule 41(b) motion also differs from a motion to dismiss for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), which requires the judge to grant all favorable inferences to the non-moving party.

12. The district judge erroneously based his Rule 41(b) findings on the standard of a Rule 50 directed verdict; that is, looking at the evidence and the inferences in the light most favorable to St. Bernard. Our disposition of the case today makes this error harmless, however.

the substance of the antitrust claims. The district court concluded that Blue Cross' reimbursement structure was a prudent, reasonable regulation with a reasonable relationship to prudent business practice. It found no evidence of any sinister or anti-competitive motive to injure St. Bernard. It found there was not a scintilla of evidence that there was any economic coercion. Since these conclusions go to the substantive merit of the antitrust allegations and require a close examination of both the evidence and the district court's interpretation of the facts, we move to a more detailed discussion of St. Bernard's claims for antitrust relief.

### C. Price Fixing Claims.

St. Bernard's evidence, presented in one day and contained in one transcript volume, is relatively simple to describe. It shows that the nine participating hospitals controlled the Blue Cross Board of Directors. It shows that Blue Cross did not deal on identical terms with St. Bernard as a contracting hospital compared to the "insider" participating hospitals. Blue Cross also refused to admit St. Bernard to participating hospital status during the years in question.

■ These facts could add up to a theory that the participating hospitals, through the medium of the Blue Cross affiliate, combined to inflict financial harm on the other New Orleans hospitals, including St. Bernard. The injury could fall within the part of section 1 of the Sherman Antitrust Act prohibiting combinations in restraint of trade. The plaintiff's precise theory of recovery is neither set forth in the pleadings nor developed at the aborted trial.[13] It could be price fixing, a per se violation of the Sherman Act, price discrimination under the Sherman Act, which is subject to

the rule of reason, or other theories of restraint of trade. Also, some claims require a showing of public injury, while others require proof of private harm. The failure of St. Bernard to specify the exact nature of its antitrust theory left it to the court to determine not only whether the evidence was enough to "go the distance," but also to measure off the length of the track.

■ During oral argument on appeal, St. Bernard suggested that price fixing was involved in this case. It relied heavily on *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). The district court in the instant case made its ruling before the *Maricopa* decision was handed down. We examine this recent Supreme Court pronouncement, then, to judge its effect on this appeal.

The *Maricopa* case examined a county-wide prepaid health plan operated by a foundation that was run by local physicians. The foundation established maximum prices for doctors' services. Nonmember physicians were free to charge their patients any fee, but the foundation would reimburse only up to the maximum on its posted fee schedule. Member physicians agreed to limit their fees to the maximum on the fee schedule. The district court and the Ninth Circuit held that the case fell under the rule of reason rather than per se principles. These courts reasoned that the pro-competitive and pro-consumer benefits of a centralized cost-containment commission overwhelmed any anticompetitive risks inherent in the broad-based agreement on prices. Relying on *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), they ruled that this case fell outside the per se

---

**13.** We find the pleadings in this case sufficient even though they do not state with particularity the exact proposed theory of relief. Rule 8 of the Federal Rules of Civil Procedure requires only fair notice of the claim. Whether a case is tried to a judge or a jury, federal courts do not insist upon technically precise pleadings. *O'Donnell v. Elgin, J. & E. Ry. Co.*, 338 U.S. 384, 392, 70 S.Ct. 200, 205, 94 L.Ed. 187 (1949). This does not mean that indefinite pleadings

are a recommended trial strategy, however. Cases like this one that assert only the barest outline of a claim often will tax the district court and burden the appellate court to "spend a day on the pleadings and the pre-trial order . . . without coming up with any definite idea of how many claims the plaintiff asserts successively or alternatively." *Plastino v. Mills*, 236 F.2d 32, 34 (9th Cir.1956).

proscriptions of the antitrust laws since the fixing of prices was only at a superficial level and not in the underlying substance. They held that the Maricopa plan was not "price fixing" in the legal sense but merely the fixing of a reasonable price schedule.

The Supreme Court reversed. It acknowledged that the foundation's maximum price schedules could serve to benefit consumers and restrain the escalating cost of physicians' services. It also acknowledged that the foundation might not harbor any anticompetitive intent. However, it still condemned the foundation's practices as illegal per se. The Court's justification was not so much the "competitive abuses or evils which those agreements were designed to eliminate or alleviate," 102 S.Ct. at 2474, quoting United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218, 60 S.Ct. 811, 842, 84 L.Ed. 1129 (1940), as much as the interests of "business certainty and litigation efficiency." 102 S.Ct. at 2473. The Court realized that the match between presumed and actual anticompetitive effects might be imperfect, but that the imprecision did not warrant the rigors of a full scale judicial inquiry into whether the prices set in each particular case were reasonable or not.

The Court acknowledged the possibility that certain price fixing schemes, perhaps even the Maricopa foundation's, could be beneficial rather than harmful to the public. Yet the opinion declares boldly that pro-competitive justifications are no defense to per se price fixing violations. As stated in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 845, 84 L.Ed. 1129 (1940): "Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." [14]

The rationale of the majority in Maricopa has drawn criticism, both on the Court, 357 U.S. at 457, 102 S.Ct. at 2480 (Powell, J. dissenting), and off. Gerhart, The Supreme Court and Antitrust Analysis: The (Near) Triumph of the Chicago School, 1982 S.Ct. Rev. 319; Easterbrook, Maximum Price Fixing, 48 U.Chi.L.Rev. 886 (1981). It is clear that the refusal of the Supreme Court to look beyond the surface effect of the pricing arrangements and examine instead the underlying competitive effect prohibits potentially beneficial as well as blatantly monopolistic restraints on pricing. The Supreme Court, though, chose to condemn price controls even when beneficial to consumers in the interest of business certainty and judicial economy.

The case before us is not entirely parallel to the Maricopa case. The fee schedules in Maricopa were strictly a horizontal restraint, created by the local physicians and applicable only to local physicians on the same tier of the supply chain. Horizontal combinations in restraint of trade are well-established to be illegal per se. See Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In today's case, by contrast, St. Bernard charges that Blue Cross, as a customer, combined with the participating hospitals, as suppliers, to prejudice St. Bernard's fiscal interests. The charges do not assume a strictly horizontal restraint, but rather include a vertical link from supplier to customer. These charges are not so clearly per se violations of the antitrust laws. See id. at 51–57, 97 S.Ct. at 2558–61.

As a further distinction, this case involves the effort of a private health care payor to fix prices, but only as to others. Maricopa involved price fixing within its own board but not as to others. In one sense, then, this case merely presents an individual board's announcement of the terms on which it will deal. Nothing in the antitrust laws prohibits an individual trader, absent an anticompetitive intent, from announcing

---

14. The Court did suggest, however, that an additional part of its rationale was the fact that it was the doctors themselves setting doctors' fees. It reserved the question of whether a valid cost-containment price schedule operated by non-physicians would constitute a per se illegal price fixing scheme. 102 S.Ct. at 2477–78.

in advance the terms on which he will deal. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). The *Colgate* doctrine, however, is inapplicable here. HSA is not a single trader, but instead is an association comprised of nine local hospitals. St. Bernard charges that the maintenance of disparate pricing schedules was not a unilateral decision on the part of HSA but rather a concerted combination on the part of all nine participating hospitals. A joint effort to fix prices is not protected under the *Colgate* doctrine.

The foundation of doctors in *Maricopa* made no attempt to contain prices to outside, non-member physicians. In today's case, by contrast, HSA has tried to contain prices only as to outsiders and is not limiting reimbursement to its own board members through the cost ceilings. Thus in this sense, this case presents a more egregious scheme of anticompetitive behavior than even *Maricopa.* It imposes burdens on outsiders but not upon the insiders who create the rules.

The *Maricopa* case, due to these dissimilarities, does not control this case. It is possible, even after *Maricopa,* that a pricing schedule could reflect a legal attempt to establish terms of dealing, rather than an illegal price fixing plan. Yet *Maricopa* does, without question, negate the logic employed in the district court here that a price fixing scheme can be legal if its effects further the public interests. Based on the teachings of *Maricopa,* which was decided after the decision of the district court in this case, we find that the hospital has made a prima facie showing of a per se price fixing violation. The case must be remanded to the district court for a full and proper consideration of the per se charges and the damages occasioned thereby.

### D. Other Antitrust Claims.

■ The claims in an antitrust case often may fit within more than one theory of antitrust recovery. St. Bernard's contention on appeal seems to be a per se price fixing violation, as discussed above. Its pleadings, however, suggest a generalized allegation under section 1 of the Sherman Act.[15] Without the benefit of more detailed pleadings or the transcript of a full trial to guide us,[16] we cannot be sure that price fixing is the sole section 1 theory St. Bernard intends to pursue. We already have found the price fixing theory substantial enough to justify a remand. Nonetheless, we address possible alternative theories of antitrust relief as additional support for our decision to remand. We begin with a discussion of refusals to deal.

■ The evidence in this case might indicate a refusal to deal, also a violation of Section 1 of the Sherman Act. Blue Cross, in addition to paying non-identical amounts to participating and contracting hospitals, would not admit St. Bernard (and perhaps other hospitals) to participating hospital status. It is clear that Blue Cross was not refusing to deal under any terms with St. Bernard, but it was refusing to deal *on the same terms* as with the nine participating hospitals. A refusal to deal on fair and equal terms can be a prohibited refusal to deal under section 1 of the Sherman Act. *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 212–13, 79 S.Ct. 705, 709–710, 3 L.Ed.2d 741 (1959); *W.W. Montague & Co. v. Lowry,* 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608 (1904).

■ Whether a refusal to deal is a per se violation of the Sherman Act or subject to the rule of reason is not always a simple inquiry. Some cases claim that concerted refusals to deal always fall under the per se category. *E.g., Klor's, Inc. v. Broadway-Hale Stores, Inc., supra.* Other cases, how-

---

**15.** St. Bernard's final amended pleadings in the district court made a simple, categorical assertion of violations of the Sherman Act and the treble damages provision of the Clayton Act. St. Bernard's counsel conceded on oral argument, however, that this case is being pursued only under section 1 of the Sherman Act, prohibiting combinations in unreasonable restraint

of trade. Other provisions of the Sherman Act are no longer in issue. There is, notably, no claim of abuse of monopoly or monopsony power under section 2.

**16.** The pleadings, nonetheless, are sufficient. *See* note 13, *supra.*

ever, clarify the legal analysis and teach that certain factors must be present for a per se analysis to apply. There must be an anticompetitive motive behind the primary purpose of the agreement. *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71 (9th Cir.1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). There must be a commercial purpose to the agreement, rather than, for example, an attempt at industry self-regulation. *United States v. United States Trotting Assn.,* 1960 Trade Cases (CCH) ¶ 69,761 (S.D.Ohio 1960). *See also United States v. Insurance Board of Cleveland,* 144 F.Supp. 684 (N.D.Ohio 1956) (rules of county association of independent insurance agents subject to rule of reason under group boycott charges). The per se category also requires coercive economic pressure. *Klor's, Inc. v. Broadway-Hale Stores, Inc., supra; United States v. New Orleans Insurance Exchange,* 148 F.Supp. 915 (E.D.La.) (J. Skelly Wright, J.), *aff'd,* 355 U.S. 22, 78 S.Ct. 96, 2 L.Ed.2d 66 (1957) (per curiam).

■ If the requisite factors for a per se refusal to deal violation are not met, the proper course is to examine the conduct under the rule of reason rather than to dismiss the charges completely. *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra.* The district court in this case found that many of the factors necessary to support a per se refusal to deal theory were not present. It ruled as part of its Rule 41(b) findings that there was no anticompetitive, sinister motive underlying Blue Cross' behavior. It ruled that the repayment terms furthermore were a reasonable method to protect the public interest and thereby enhance, rather than inhibit, competition.

■ We have carefully reviewed the evidence in this case and are hard-pressed to define support for the reasons the district court articulated for denying a claim of refusal to deal. The district court found there was no hard evidence of anti-competitive motive. However, the law does not require a "smoking gun" to prove concerted antitrust activity. *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1117 (5th Cir.1979). Dr. Bertucci did testify in a deposition read in open court that he did not feel that St. Bernard competed with the other New Orleans area hospitals. Yet the surrounding circumstances of this testimony suggest that Dr. Bertucci was discussing competition only in the marketing or advertising context, and not with regard to formalized antitrust analysis. The district court concluded that there was competition of a sort among area hospitals. Indeed, any other holding would be illogical.

As to the district court's holding that any refusal to deal equally was reasonable, we notice that the prima facie effects of antitrust behavior have been shown. The only readily-apparent escape would be an affirmative defense that the restrictions were reasonable, or were the least restrictive methods to achieve a legitimate business goal. We cannot make such a finding until the defendant presents its case. Even that evidence, were it to be presented, would of course not counter a per se violation.

We find that the refusal to deal theory also requires remand for a proper disposition. Once again, we offer no opinion on the ultimate merits of the case, as there has not yet been a full trial.[17] We cannot even categorize the nature of St. Bernard's claims as per se violations or rule of reason determinations under section 1 of the Sher-

17. During the years in question, the nonprofit Blue Cross corporation offered the benefits of membership, *i.e.* participating hospital status, only to those hospitals that were organized and operated exclusively for the public benefit as nonprofit organizations. St. Bernard was a for-profit, proprietary hospital. It was organized to make a profit for its shareholders rather than to serve the general public welfare.

The theoretical distinction between for-profit and nonprofit hospitals has blurred in recent years, especially since even nonprofit hospitals do not necessarily have an obligation to provide free charitable care. *See* Rev.Rul. 69–545, 1969–2 Cum.Bull. 117 (hospitals may, under some circumstances, qualify for tax exemptions under I.R.C. §§ 170, 501(c)(3) without providing charitable care); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Some commentators have questioned whether any distinction between nonprofit and for-profit hospitals continues to be viable. Clark, *Does the Nonprofit Form Fit the Hospital Industry?,*

man Act. We have, however, examined the evidence presented to the district court and concluded that undisputed credible evidence supports the possibility of a refusal to deal claim under section 1. This fact is an additional underpinning for our decision to remand this case for further proceedings.

Having found sufficient grounds to remand, we do not consider it appropriate to sift through all the facts of this case to uncover every possible theory of recovery under section 1 of the Sherman Act. We do point out, however, that we do not intend our opinion to foreclose grounds for possible recovery under section 1 that we do not discuss explicitly in this opinion.[18]

Due to the vague nature of the pleadings, we do not know if St. Bernard intends to pursue section 1 theories not covered in today's opinion. We therefore postpone any definitive ruling on whether additional specific theories are supportable in this case, either in law or fact.

### Motion to Consolidate

St. Bernard also asks us to review the denial of its motion to consolidate this case with a similar set of actions pending in the same district court. As we mentioned earlier in this opinion, four other Blue Cross contracting hospitals in the New Orleans area have filed charges against HSA, presenting similar antitrust allegations based on the same disparate reimbursement formulas involved in the present proceeding. These four other cases have been consolidated for purposes of discovery and trial. St. Bernard moved repeatedly for consolidation with these other cases, and the other plaintiff hospitals supported the motion. The district court, however, denied this attempt to consolidate the cases.

Consolidating actions in a district court is proper when the cases involve common questions of law and fact, and the district judge finds that it would avoid unnecessary costs or delay. Fed.R.Civ.P. 42; *In re Dearborn Marine Service, Inc.,* 499 F.2d 263, 270–71 (5th Cir.1974), *cert. dism'd,* 423 U.S. 886, 96 S.Ct. 163, 46 L.Ed.2d 118 (1975). Consolidation is improper if it would prejudice the rights of the parties. *Dupont v. Southern Pacific Co.,* 366 F.2d 193, 195–96 (5th Cir.1966), *cert. denied,* 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 106 (1967). The district court may order consolidation despite the opposition of the parties. *In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972,* 549 F.2d 1006, 1013 (5th Cir.1977). The fact that a defendant may be involved in one case and not the other is not sufficient to avoid consolidation. *Bottazzi v. Petroleum Helicopters, Inc.,* 664 F.2d 49 (5th Cir.1981). The power of the district court to consolidate is purely discretionary. *Chatham Condominium Assns. v. Century Village, Inc.,* 597 F.2d 1002, 1013–14 (5th Cir.1979).

In the case before us, the district judge gave detailed reasons for his denying the motion to consolidate. Some of the reasons given for the ruling are difficult to

---

93 Harv.L.Rev. 1416 (1980); Note, *Dissolution of Public Charity Corporations: Preventing Improper Dissolution of Assets,* 59 Texas L.Rev. 1429, 1430–32 (1981). In any event, valid legal distinctions between the two types of hospitals still exist, and Blue Cross might have had statutory or policy-based justifications during the years in question for its refusal to offer equal, participating hospital status to St. Bernard.

The record also shows that all nine participating hospitals met the accreditation standards of the JCAH during the years in question. This was a condition of participating hospital status. St. Bernard, by contrast, was not JCAH approved. It was, however, properly licensed by the State of Louisiana. Yet the support in the record for valid reasons Blue Cross might have had to discriminate against St. Bernard is not now a concern of this Court. Our role is merely to review whether St. Bernard presented sufficient evidence during the aborted trial to survive a motion for involuntary dismissal.

**18.** The facts might, for example, constitute price discrimination. Price discrimination normally falls under the Robinson-Patman Act, 15 U.S.C. §§ 13–13b, 21a, a statute not discussed in the pleadings. Yet price discrimination might also be evidence of a combination that unreasonably restrains trade in violation of the Sherman Act. *See* Trade Reg.Rptr. (CCH) ¶¶ 3200, 3460 (might constitute Sherman Act violation). *Cf.* L. Sullivan, *Handbook on the Law of Antitrust,* § 220, at 684 (1977) (Robinson-Patman is an analogue to section 2 of the Sherman Act, making no mention of section 1).

accept.[19] However, the district judge also ruled that consolidation would be improper because the cases were at different stages of preparedness for trial. At the time of his ruling, the St. Bernard case was ready for trial, while the other cases were still in the discovery stages. The delay to the instant action, which already has languished in the federal court system for over a decade, reasonably could have led to the conclusion that this case should be heard separately from the consolidated cases. *La Chemise Lacoste v. Alligator Co.,* 60 F.R.D. 164, 176 (D.Del.1973); *Transeastern Shipping Corp. v. India Supply Mission,* 53 F.R.D. 204 (S.D.N.Y.1971). *See also* Moore's Federal Practice ¶ 42.02[3].

We cannot say that the denial of consolidation was an abuse of the district court's broad discretion.

We note, however, that our decision today changes the circumstances that affect the question of consolidation. We are remanding for a new trial on the merits, which might be some months away. The four consolidated cases, meanwhile, have proceeded through discovery and are also just a few months away from trial. Because our decision today alters the circumstances surrounding the motion to consolidate, the district court should reconsider the motion to consolidate and rule on whether the interests of judicial economy and fundamental fairness to the parties support consolidation at this time. The decision lies properly in the sound discretion of the district court and not in the Court of Appeals.

### Conclusion

We find that the evidence St. Bernard presented at trial establishes the basis of a

19. One example is the court's statement that the costs to the parties would increase if consolidation were allowed. The defendant's costs would likely be lower through consolidation, since it would mean defending only one suit rather than two. Regarding burdens to the plaintiffs in the many cases, another reason noted in the district court, we point out that St. Bernard and the plaintiffs in the other cases are all in support of consolidation.

20. Since the plaintiff has already presented a case in chief, there is no need for a totally new

claim under section 1 of the Sherman Act, sufficient to support a treble damage claim under the Clayton Act. We therefore reverse the imposition of involuntary dismissal under Fed.R.Civ.P. 41(b) and remand for additional proceedings.[20] We find that the denial of the motion to consolidate this claim with similar cases pending in the same district court was not an abuse of discretion at the time, but remand for reconsideration of the motion in light of the changed circumstances stemming, inter alia, from today's opinion.

REVERSED AND REMANDED.

trial unless the cases are consolidated. The plaintiff's case will be part of the record on remand, and the plaintiff need not make a new presentation of its case in chief. *United States v. United States Gypsum Co.,* 333 U.S. 364, 402 & n. 20, 68 S.Ct. 525, 545 & n. 20, 92 L.Ed. 746 (1948). The plaintiff, however, is not limited to that evidence already in the record, and may supplement the record with evidence either in chief or in rebuttal. *White v. Rimrock Tidelands, Inc.,* 414 F.2d 1336, 1340 & n. 7 (5th Cir.1969).