718 F.2d 1260
 1983-2 Trade Cases 65,641
 John M. RATINO, M.D., Appellant,
v.
MEDICAL SERVICE OF the DISTRICT OF COLUMBIA (BLUE SHIELD);
Montgomery County (Maryland) Medical Society, Inc.; Stephen
N. Jones, M.D.; Robert A. Barnett, M.D.; Henry M. Wise,
M.D.; Ira Miller, M.D.; Holy Cross Hospital of Silver
Spring, Incorporated, Appellees.
 No. 81-1798.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 11, 1983.
Decided Sept. 28, 1983.
Rehearing and Rehearing En Banc Denied Nov. 4, 1983.
 
 Daniel S. Orci, Jr., Washington, D.C. (Edward Brown Williams, Harter, Calhoun & Williams, Washington, D.C., on brief), for appellant.
 Charles J. Steele, Washington, D.C. (Jacqueline M. Saue, Washington, D.C., on brief), for appellee Medical Service of the District of Columbia.
 Gerald J. O'Brien, Rockville, Md. (Stanley J. Nadonley, Rockville, Md., on brief), for appellee Holy Cross Hosp. of Silver Spring, Inc.
 Thomas F. Fitzgerald, Whiteford, Hart, Carmody & Wilson; Albert D. Brault, Janet S. Zigler, Washington, D.C., on brief, for appellees Wise and Miller.
 William A. Ehrmantraut, Donahue, Ehrmantraut & Montedonico, Chartered, Rockville, Md., on brief, for appellees Wise, Miller, Barnett & Jones.
 Kenneth Armstrong, Rockville, Md., on brief, for appellee Montgomery County Medical Society.
 Before HALL, MURNAGHAN and SPROUSE, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 John M. Ratino, a plastic and reconstructive surgeon,[1] appeals from a judgment of the district court granting the defendants' motions for summary judgment in this antitrust action. Ratino's complaint asserted four basic claims against the defendants, Medical Service of the District of Columbia (Blue Shield),[2] Montgomery County Medical Society (MCMS), Holy Cross Hospital, and physicians Ira Miller, Stephen Jones, Henry Wise, and Robert Barnett.[3] His first two claims allege Sherman Act[4] violations: (1) that Blue Shield's "usual, customary and reasonable" (UCR) insurance plan, which involves "provider agreements" and "peer review committees," constitutes an illegal price fixing arrangement;[5] and (2) that the defendants illegally conspired to restrain him from using a consent form in conjunction with providing his services in emergency rooms. Ratino's third and fourth allegations charge that these same activities violate Maryland's Antitrust Act[6] and its common law prohibition against restraints of trade.[7]
 
 
 2
 The district court held that the design and implementation of Blue Shield's UCR plan was exempt from federal antitrust laws under the "business of insurance" exception contained in the McCarran-Ferguson Act.[8] It next held that the contract upon which Ratino based his second claim was a contract of adhesion devoid of any right to protection under the Sherman Act. Having granted summary judgment against Ratino on the two federal claims, the district court dismissed the two pendent state claims for lack of jurisdiction. We affirm that portion of the district court's judgment as to Ratino's second claim--the "consent form" claim, but reverse and remand as to his other contentions.
 
 I.
 
 3
 We first consider and affirm the district court's summary judgment against Ratino on his claim relating to the emergency room consent form.
 
 
 4
 Ratino alleged that Holy Cross Hospital and the individual physician defendants conspired to restrain his ability to compete in the medical and surgical trade.[9] He specifically charged that the physicians, in their capacities as officers of the Professional Relations Committee and Peer Review Committee of MCMS, sought to prevent him from using his "consent for specialist care" form prior to rendering care in emergency rooms in area hospitals. Holy Cross Hospital, the only hospital charged with specifically directing Ratino to cease using the form, is alleged to have conspired with the physician defendants in taking that action.
 
 
 5
 The consent form used by Ratino essentially consists of an agreement by the patient to pay Ratino's charges for the services about to be rendered, the amount to be determined after the medical care is provided. The form provides in part:
 
 
 6
 [i]t is ... understood that such fees may exceed amounts allowed by the fee schedules of insurance companies ... or any other individual or Fee Review Commission not present when the care or surgery is rendered. This specifically includes such fee designations as usual and customary for similar care or surgery rendered by doctors without similar special training. Thus, the patient's liability includes any and all differences between the amounts paid by insurance or other third parties and the fee charged. Liability also includes physician fees for time used or required for preparation of reports, testimony or court appearances.... All amounts are to be paid in full within 30 days of service.... In the event the amount due is not timely paid, the patient ... will be responsible for all collection costs, interest on the unpaid amount at the full legal rate, attorney fees and court costs should collection procedures become necessary. Collection charges are 50% of balance due.
 
 
 7
 Ratino used this form in his general practice and in emergency room situations.
 
 
 8
 The record shows that MCMS received a number of complaints concerning Ratino's use of the consent form prior to performing emergency room treatment.[10] Doctor Wise, who was a member of MCMS's Professional Relations Committee at a time when complaints were received, drafted a letter outlining MCMS's position on the use of such forms in emergency rooms. The letter stated that MCMS rejects the practice of patients being asked to sign a contract agreeing to pay a stated sum for medical care before the physician will proceed with emergency care, and asked hospital administrators to suppress such conduct in their emergency rooms. The letter did not mention Doctor Ratino, and only pertained to the use of such forms in emergency rooms. Doctor Jones, then Chairman of the Professional Relations Committee, sent the letter in March of 1977 to the administrators of various area hospitals, including Holy Cross.[11]
 
 
 9
 Some of the administrators from the area hospitals responded that they had a policy against the use of such forms in emergency rooms. In March, 1977, Holy Cross wrote Doctor Jones stating "we wish to advise that Holy Cross Hospital of Silver Springs has an open door policy with respect to charity care and renders treatment to all persons regardless of their ability to pay." In 1978, Holy Cross's Executive Committee directed Ratino to cease use of the consent form in Holy Cross Hospital.
 
 
 10
 The district court held that the consent form was a contract of adhesion, finding that there is no possibility of equal bargaining power between a provider of health care services and a patient in need of emergency care. The trial court was especially concerned that a patient in an emergency room situation would not be capable of understanding and assenting to fee and collection forms in light of his physical, emotional and mental state. The court found the contract illegal, in violation of public policy. It concluded that such a contract cannot form the basis of a trade which can be illegally restrained and thus subject to a cause of action under the Sherman Act.
 
 
 11
 We agree that the activities complained of do not constitute an unreasonable restraint of trade. The defendants simply sought to protect patients who might be unable to protect themselves in medical emergencies. The letter from MCMS merely identified a clearly abusive practice which it recommended should not be condoned at area hospitals. The letter did not mention Ratino's name, nor impose any requirement against such practice. The evidence indicates that Holy Cross, the only hospital alleged to have expressly directed Ratino to cease using the form at its facility, was not responding to the MCMS letter in taking such action, but merely was unilaterally carrying out its long established policy of providing care to patients regardless of their financial means. Indeed, there is no evidence of anticompetitive purpose on the part of any of the defendants, but the facts show an attempt on the part of medical care organizations to implement their own policies aimed at safeguarding the health and welfare of emergency room patients. See Neeld v. National Hockey League, 594 F.2d 1297 (9th Cir.1979).
 
 II.
 
 12
 The court erred, however, in granting summary judgment against Ratino on his other claims, which were raised in count one of his complaint. Ratino alleged that the design and implementation of Blue Shield's UCR insurance plan violates the Sherman Act. He charged that Blue Shield and the individual defendants conspired to fix and enforce prices for medical care in the Washington, D.C. metropolitan area at the UCR rates.[12]
 
 
 13
 Blue Shield is a non-profit corporation providing prepaid medical and surgical insurance principally to individuals in the District of Columbia metropolitan area. Approximately 1.4 million individuals are enrolled with Blue Shield plans, which comprises 80% of all individuals covered by health care in the Washington area. Blue Shield has participating agreements with approximately 93 percent of the physicians in the area.
 
 
 14
 Blue Shield has offered its UCR plan to subscribers since 1971. Policyholders enrolled in the UCR plan are assured full payment of charges for treatment received from a "participating physician." Furthermore, Blue Shield pays the bills of participating physicians directly.[13] While Blue Shield pays for treatment received from a nonparticipating physician, the policyholder must pay the bill and seek reimbursement from Blue Shield. In addition, the policyholder is responsible to pay any amount charged for a particular service by a nonparticipating physician over the UCR rates established for that service.
 
 
 15
 A participating physician executes a bilateral "provider agreement" with Blue Shield. The agreement specifies that Blue Shield will pay a participating physician for treatment rendered to a subscriber at the UCR rates. The physician, in turn, agrees to provide his services to policyholders, and accept Blue Shield's UCR rates as payment in full for his services. The agreement further provides that the UCR plan will be reviewed biannually by the Medical Advisory Council and the Board of Trustees, and submitted to the participating physicians to vote on continuation or cancellation of the program on renewal dates.
 
 
 16
 Blue Shield's UCR rates refer to the "usual, customary or reasonable" fee for particular services. A usual fee is one a physician himself would charge for a given service. Blue Shield pays in full usual charges which are at or below the "customary" amount. "Customary" is that range of usual fees charged by physicians of similar training and experience for the same service within a given geographic or socio-economic level. Blue Shield calculates the customary charge by taking the 90th percentile of usual charges submitted to it by physicians for a given service. The customary amount is revised annually. A fee in excess of the customary amount will be paid if there are special circumstances, such as medical complications,[14] under which the fee is considered reasonable. If Blue Shield believes that a fee is not reasonable, the dispute is referred to a fee review committee, such as that of MCMS.
 
 
 17
 The fee review committee of MCMS is made up entirely of practicing physicians.[15] The individual defendants in this case have served on MCMS's fee review committee at various times. In resolving a dispute, the committee requests the physician to submit whatever additional information he or she believes would be helpful to the committee in making its determination. The committee then submits a write-up of the case to three or more physicians in the same specialty as that of the treating physician. The full committee then considers the replies, and decides what a reasonable fee is for the particular service rendered in light of the special circumstances.[16] That determination is binding on a participating physician, and is the amount Blue Shield will reimburse a subscriber who was treated by a nonparticipating physician.[17]
 
 
 18
 Ratino withdrew from Blue Shield as a participating physician in 1974 because of his dissatisfaction with its refusal to pay the full amount of some of his charges. He contends that the defendants, through the design and implementation of the UCR plan, are attempting to force him and other non-participating physicians to charge their patients the UCR rates. When Blue Shield refuses to pay the full amount of a nonparticipating physician's bill, the patient is led to believe that the charge was unreasonable, and is encouraged to obtain future services from participating physicians, unless the nonparticipating physician lowers his fees in line with the UCR rates. Ratino contends that the pressure to conform is especially great because of the large number of area subscribers Blue Shield enrolls and the large number of participating physicians who are required by agreement to accept the UCR rates as full payment. Ratino also argues that when a peer review committee denies a fee, it lends the imprimatur of the local medical society as to the unreasonableness of the fee. He further alleges that members of the peer review committee have sought to coerce him into reducing his charges in accordance with the UCR rates. When he failed to comply with the committee's requests, he alleges that the committee threatened to recommend him for disciplinary action, and that some of the peer review members interfered with his hospital privileges and patient referrals at area hospitals where they were members.
 
 A.
 
 19
 The district court held that the design and implementation of the UCR plan fall within the McCarran-Ferguson Act's "business of insurance" exemption. The defendants further argue that the activities are exempt from the federal antitrust laws under the Parker v. Brown[18] "state action" exception. We hold that neither of these exemptions apply in this case.
 
 1.
 
 20
 The district court, relying on our decision in Bartholomew v. Virginia Chiropractic Ass., 612 F.2d 812 (4th Cir.1979), held that the activities challenged in count one were exempt from federal antitrust laws because they constitute the "business of insurance" under the McCarran-Ferguson Act.[19] While the district court may have correctly applied Bartholomew, that part of the case has been implicitly overruled by the Supreme Court's recent holding in Union Labor Life Ins. Co. v. Pireno, --- U.S. ----, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982).
 
 
 21
 In Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), the Supreme Court extensively analyzed the "business of insurance" antitrust exemption provided by the McCarran-Ferguson Act. In Royal Drug, Blue Shield, a Texas insurance company, offered policies entitling insured persons to purchase prescription drugs for $2 each from any pharmacy participating in a "Pharmacy Agreement" with Blue Shield. A policyholder could also purchase drugs from nonparticipating pharmacies, but he would have to pay the full price for the drugs and would be reimbursed by Blue Shield for only part of the price. Blue Shield offered Pharmacy Agreements to all licensed pharmacies in Texas. Under the agreement, participating pharmacies were required to sell prescription drugs to Blue Shield's policyholders for $2 each, and were directly reimbursed an additional amount by Blue Shield equaling their costs in acquiring the drugs sold.
 
 
 22
 The Court held that the Pharmacy Agreements did not constitute the "business of insurance." It first noted that the McCarran-Ferguson Act does not exempt the business of insurance companies from the scope of the antitrust laws, but only the "business of insurance." Id. at 210-11, 99 S.Ct. at 1072-73. It then identified three criteria relevant in determining whether a particular practice is part of the "business of insurance": first, whether the practice has the effect of transferring or spreading a policyholder's risk, id. at 211-12, 99 S.Ct. at 1073-74; second, whether the practice is an integral part of the policy relationship between the insurer and insured, id. at 215-16, 99 S.Ct. at 1075-76; and third, whether the practice is limited to entities within the insurance industry, id. at 231, 99 S.Ct. at 1083. Finding none of the factors applicable to the Pharmacy Agreements, the Court held that the McCarran Act exemption did not apply.
 
 
 23
 In Bartholomew, five chiropractors sued members of a peer review committee, the association under whose auspices the committee acted and three insurers. The association was involved in establishing fee schedules, and the peer review committee was involved in resolving individual disputes. In holding that these activities constituted the business of insurance, we distinguished Royal Drug, finding that each defendant's activities touched upon the business of insurance, and that there was "an integration of component acts resulting in a single, composite business-insurance." 612 F.2d at 817.
 
 
 24
 The district court in the case sub judice noted the substantial similarity between the present case and Bartholomew. It found that "MSDC set up usual, customary and reasonable fees in conjunction with MCMS and others, and had a mechanism whereby it or other physicians could have a fee reviewed." It concluded that this case, like Bartholomew, involved the "business of insurance."[20]
 
 
 25
 Subsequent to the district court's decision, however, the Supreme Court in Pireno, a case involving facts parallel to those in Bartholomew, held that peer review activities do not constitute the "business of insurance." --- U.S. ----, 102 S.Ct. 3002, 73 L.Ed.2d 647. In applying the three criteria articulated in Royal Drug, the Court held that: (1) "the challenged peer review arrangement is logically and temporally unconnected to the transfer of risk accomplished by [the] insurance policies"; (2) the "use of [the] Peer Review Committee is not an integral part of the policy relationship between the insurer and insured"; and (3) the "use of [the] Peer Review Committee inevitably involves third parties wholly outside the insurance industry--namely, practicing chiropractors." Id. --- U.S. at ----, 102 S.Ct. at 3010, 73 L.Ed.2d at 656-59. Pireno, therefore, implicitly overruled Bartholomew to the extent that the latter held such practices to constitute the "business of insurance."[21]
 
 
 26
 Applying Pireno and Royal Drug to the immediate case, the challenged activities clearly cannot be characterized as the "business of insurance." The peer review activities are indistinguishable from those in Pireno. Moreover, the provider agreements are not dissimilar from those in Royal Drug. Therefore, the alleged illegal practices in count one of Ratino's complaint are not exempt from antitrust scrutiny under the McCarran-Ferguson Act.
 
 2.
 
 27
 The defendants nevertheless contend that the activities complained of in this suit are exempt from antitrust scrutiny under a different theory--that announced by the Supreme Court in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In Parker, the Supreme Court rejected a Sherman Act challenge to a raisin marketing program promulgated under the California Agriculture Prorate Act "to restrict competition among the growers [of raisins] and maintain prices in distribution of their commodities to packers." Id. at 346, 63 S.Ct. at 311. Under the challenged program, the State Agricultural Prorate Advisory Commission authorized an organization of local cooperatives to develop marketing policies for the raisin crop. The Advisory Commission was appointed by the Governor, and had to approve the cooperative's policies following public hearing. The Court found that "it is the state which has created the machinery for establishing the prorate program.... [I]t is the state, acting through the commission, which adopts the program and enforces it...." Id. at 352, 63 S.Ct. at 314. The Court held that the Sherman Act did not intend "to restrain state action or official action directed by a state," and thus did not apply to the challenged program. Id. at 351, 63 S.Ct. at 313. The Court expressly noted, however, that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful...." Id.
 
 
 28
 The decisions applying Parker establish two standards for antitrust immunity under Parker v. Brown: First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; second, the policy must be "actively supervised" by the state itself. City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978); California Liquor Dealers v. Midcal Aluminum, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). In Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), for example, the Court concluded that fee schedules enforced by a state bar association, which had been granted power to issue ethical opinions, were not mandated by ethical standards established by the State Supreme Court. The fee schedules, therefore, were not immune from antitrust attack. The Court said "[i]t is not enough that ... anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the state acting as a sovereign." Id. at 791, 95 S.Ct. at 2015. In California Liquor Dealers, supra, which involved resale price maintenance of wine prices, the Court found a clear legislative policy to permit such anticompetitive practice, but found that the program failed the second standard. It found that while the state authorized the price-setting, the prices were established and enforced by private parties, and the state did not even review the reasonableness of the prices established. Id. 445 at 105-06, 100 S.Ct. at 943-44.
 
 
 29
 Turning to the MCMS practices challenged in the instant case, we examine the Maryland law to determine if the practices met the Parker standards for antitrust immunity. Article 43, Section 130, of the Maryland Code provides for the establishment of a Commission on Medical Discipline. The Commission is authorized by statute to reprimand a physician, place him on probation or revoke or suspend his license for a number of causes, including gross and willful and continued overcharging for professional services. Id. Sec. 130(h)(16). Cases coming to the Commission's attention are referred to appropriate local county medical societies, such as MCMS, for investigation and report. Id. Sec. 130(g)(1). The report is to contain recommendations the investigation reveals may be necessary for adequate disciplinary procedures. Id. The recommendations are then considered by the Commission, which takes whatever action it deems appropriate. Id. A local medical society may also initiate an investigation based upon a complaint, but handles such cases the same as if it had been referred by the Commission. Id. Sec. 130(g)(2).
 
 
 30
 This Maryland statute clearly articulates a policy against gross and willful overcharging. It further contemplates that medical societies, such as MCMS, will be involved in investigating complaints and making recommendations to the Commission. This policy, however, clearly cannot be stretched to include MCMS's activities in assisting Blue Shield implement its UCR plan. We also believe that this statutory expression does not provide a shield for any anticompetitive activities that may result from MCMS's carrying out its perceived responsibility under the statute. The statute merely states that MCMS, at the initiation of the Commission, shall investigate and report, and that MCMS may also voluntarily initiate an investigation of a complaint. There is no indication of a policy that MCMS police physician charges, and there is no indication of a state policy that MCMS engage in anticompetitive activities in executing its responsibilities.[22] Furthermore, it is the Commission which executes the policies of the statute, not local medical societies. In any event, the statute does not provide for supervision of MCMS's investigatory and reporting activities, and thus the second standard of Parker is not met. Therefore, the Parker v. Brown exemption does not apply to the activities challenged in this case.
 
 B.
 
 31
 Since we find no exemption shielding the practices challenged in count one from antitrust scrutiny, they must be analyzed under the antitrust laws. Ratino alleges that the agreements and activities of Blue Shield, participating physicians, and the peer review committees constitute a combination in restraint of trade whose purpose and effect is to fix prices of medical services in the Washington, D.C. metropolitan area, and are thus per se illegal. The defendants contend that their activities do not constitute price fixing, nor in any way unreasonably restrain trade. Since the district court granted summary judgment to the defendants on the basis of the "business of insurance" exemption, it did not address the antitrust issues. We believe that there are critical issues of fact to be resolved, and that the complexity, novelty, and importance of the issues involved necessitate that we remand for a full development at trial of the issues discussed in the following sections.[23]1.
 
 
 32
 Section One of the Sherman Act literally prohibits every agreement in "restraint of trade."[24] The Supreme Court, however, has applied the Sherman Act to prohibit only unreasonable restraints of trade. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). The "rule of reason" requires the factfinder to decide whether under all the circumstances of the case, the restrictive practice imposes an unreasonable restraint on competition. Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).
 
 
 33
 The Supreme Court over the years also has developed per se rules. Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable. Arizona v. Maricopa County Medical Society, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).
 
 
 34
 The Supreme Court has consistently held that price-fixing agreements are per se unlawful. In United States v. Trenton Potteries, 273 U.S. 392, 397, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1927), the Court said:
 
 
 35
 The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow.
 
 
 36
 The Court in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940), defined a price fixing agreement as "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate or foreign commerce."
 
 
 37
 The Supreme Court has applied the per se rule against price fixing in a number of different situations. In Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), the Court held that the per se rule applied to agreements fixing maximum as well as minimum prices, stating that "such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." Id. at 213, 71 S.Ct. at 260. The Court has also made clear that the per se rule applies to vertical as well as horizontal arrangements, see Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), and in Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court removed any possible doubt as to the application of the per se price fixing rule, and federal antitrust laws in general, to the professions.
 
 
 38
 It is well settled, however, that the per se characterization is not to be applied as a talisman to every arrangement that involves a "literal" fixing of prices. Many lawful contracts, mergers, and partnerships fix prices. The inquiry in an antitrust case is not simply one of "determining whether two or more potential competitors have literally 'fixed' a 'price.' ... [Rather], it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label 'per se price fixing.' " Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 9, 99 S.Ct. 1551, 1557, 60 L.Ed.2d 1 (1979). Before characterizing an arrangement as a per se price fixing agreement meriting condemnation, a court should determine whether it is a "naked restrain[t] of trade with no purpose except stifling of competition." United States v. Topco Associates, Inc., 405 U.S. 596, 608, 92 S.Ct. 1126, 1133-34, 31 L.Ed.2d 515 (1972), quoting White Motor Co. v. United States, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). See also Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49-50, 97 S.Ct. 2549, 2557-58, 53 L.Ed.2d 568 (1977). As part of this inquiry, a court must determine whether the procompetitive economies that the arrangement purportedly makes possible are substantial and realizable in the absence of such an agreement. See National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).
 
 
 39
 The Supreme Court in Maricopa, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), recently found a medical insurance plan to be per se illegal as price fixing. Maricopa involved a fee-for-service plan administered by a non-profit medical care foundation.[25] A subscriber was guaranteed complete coverage for the full amount of his medical bills, but only if he was treated by a participating physician. The subscriber was free to employ nonmember physicians and was covered for charges that did not exceed a maximum fee schedule, but he was responsible to pay any excess that the nonmember physician may charge. Participating physicians agreed to accept scheduled amounts as payment in full for their services to policyholders. The physicians could charge less than the schedule amount, and charges to uninsured patients were unrestricted.
 
 
 40
 The medical foundation established and periodically revised the maximum fee schedule. The foundation board of trustees solicited advice from various medical societies concerning the need for a change in rates in their respective specialties. The board then formulated the new fee schedule, and submitted it to the vote of the entire membership.
 
 
 41
 The Court held that the doctors' concerted participation in the fee setting mechanism was a per se violation of the Sherman Act. "An agreement among competing physicians setting ... the maximum fees that may be claimed in full payment for health services provided to policyholders of specified insurance plans," the Court said, constituted illegal price-fixing. Id. 457 U.S. at 335-36, 102 S.Ct. at 2469, 73 L.Ed.2d at 53.
 
 
 42
 Ratino contends that Blue Shield's mechanism for fixing the "customary" fee schedule is invalid under Maricopa.[26] He further alleges that the "provider agreements" and "peer review" activities, standing alone, constitute illegal price fixing agreements. Finally, he alleges that the defendants have sought to enforce the fixed prices against him through intimidation, boycott, and the exercise by Blue Shield of its monopoly power.
 
 
 43
 It is true that the "customary" fee schedule is a maximum fee schedule very similar to the one in Maricopa. In the immediate case, however, there is no overt agreement among competing physicians establishing the maximum fee schedule as was accomplished by the medical foundation in Maricopa. That distinction, of course, does not preclude a finding of an agreement to fix prices. To the extent the program might camouflage or embody an agreement among competing physicians, it will constitute per se illegal price fixing. See United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).
 
 
 44
 Ratino raised a number of allegations in his complaint which if proved could be indicative of a conspiracy to fix the customary fee:
 
 
 45
 (1) He alleged that Blue Shield's Board of Trustees, which is responsible for establishing the UCR fee schedule, is controlled by physicians, and thus physicians effectively control the determination of the fee schedule.[27]
 
 
 46
 (2) He alleged that physicians control the fee schedule in that Blue Shield's agreement with participating physicians provides that: (a) it will not change any of the mechanics "without the approval of the participating physicians by mail ballot for the life of the UCR program"; and (b) "the UCR ... plan will be reviewed biannually by the medical advisory council and the Board of Trustees and submitted to the participating physicians to vote on continuation or cancellation of the program on renewal dates."
 
 
 47
 (3) He alleged that the customary fee ceiling--arrived at by taking the 90th percentile of usual fees submitted for particular services--is a system whereby physicians collectively exert control on what the maximum fee schedule should be through submitting their bills to Blue Shield.[28] Ratino alleged that participating physicians, in effect conspire without necessarily directly communicating--that through various means they individually obtain information concerning how the system works from Blue Shield, which is the central collector and user of the information employed in the alleged price-fixing scheme. He alleges that each individual physician obtains the information concerning the maximum fees through submission of higher fees until they exceed the customary ones. Once obtaining information as to the maximum allowable fees, he contends that physicians adjust their fees to obtain the maximum price allowed by the Blue Shield system for each service and, at the same time, act to continually escalate the maximum allowable fee.
 
 
 48
 (4) Ratino alleged that the peer review committees act as a policing mechanism aimed at intimidating participating as well as nonparticipating physicians into conformity with the customary fee schedule; and alleged numerous instances of the fee review committee attempts to dictate his fees through coercion.
 
 
 49
 We cannot predict whether Ratino will be able to prove these allegations. It no doubt will be difficult, but the scenarios he alleges are not so improbable that he should not have an opportunity to resolve the allegations as primary issues of fact. If the district court finds that in effect the physicians control the customary fee, under Maricopa it must find such practice per se illegal.
 
 
 50
 Ratino also alleged in his complaint that the actions of the peer review committee--which is composed of competing physicians--alone constitute illegal price fixing in determining the "reasonable" fee for particular services. While we leave the initial determination of the review committee's legitimacy under the antitrust laws to the district court, we note that the courts have had far too limited experience with such committees to hastily and generally judge their effects on competition. They undoubtedly can serve as useful mechanisms for identifying and correcting abuses in the medical profession's pricing practices, if properly implemented and carefully monitored. There are, however, borders beyond which a peer review committee cannot trespass; and one of those borders is price fixing. The district court, therefore, should carefully scrutinize the purposes and practices of the challenged review committee to determine whether its effect on prices is merely ancillary to other legitimate purposes. See Broadcast Music, 441 U.S. at 20, 99 S.Ct. at 1562.
 
 
 51
 A similar inquiry is required with respect to Ratino's argument that the provider agreements, standing alone, constitute price fixing. Again, the court's limited experience with these types of agreements counsels against too quickly categorizing them as per se illegal. See Medical Arts Pharmacy v. Blue Cross & Blue Shield, 518 F.Supp. 1100, 1107 (D.Conn.1980); see also Royal Drug, 440 U.S. at 214, 99 S.Ct. at 1074.
 
 2.
 
 52
 If on remand the district court concludes that the challenged activities do not constitute a price fixing conspiracy, or a proscribed boycott,[29] it must then analyze the practices under the rule of reason. The rule of reason requires the factfinder to decide whether under all circumstances of the case the restrictive practice imposes an unreasonable restraint on competition. The court must consider "whether the restraint imposed is such as merely regulates and thereby promotes competition or whether it is such as may suppress or even destroy competition." Chicago Bd. of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). The district court should consider, among other things, the facts peculiar to the health care industry, the effect of the activities on health providers, and the impact of the activities on costs to the ultimate consumer. The history of the restraint and the purpose or end sought are also relevant facts. Id.
 
 
 53
 While Ratino does not properly allege a violation of section 2 of the Sherman Act, his complaint can be read as alleging that Blue Shield is in a monopolistic position in the District of Columbia area. Regardless of the effect of this as a section 2 violation vel non, it is a circumstance which can be considered in weighing the economic effects of the Blue Shield program.
 
 C.
 
 54
 We agree with Doctor Barnett's assertion that Ratino's claims against him are barred by the Sherman Act's time limitations. His only connection with Ratino's allegations concerns a letter he wrote in 1973 while chairman of the MCMS Professional Relations Committee to Ratino about some adverse publicity Ratino may receive from a suit he had brought against a patient. The record indicates that Barnett otherwise did not participate in the challenged activities. Thus, Barnett's actions occurred approximately five and one-half years before Ratino filed this suit on May 18, 1979, and thus the Sherman Act's four year limitation period bars Ratino's claims against him. 15 U.S.C. Sec. 15b. On remand, the case against Doctor Barnett should be dismissed.
 
 III.
 
 55
 The district court's judgment on count two is affirmed, but is reversed and remanded as to the remainder of the complaint for proceedings consistent with the views expressed in this opinion, including the dismissal of the cases against Doctor Barnett and the Holy Cross Hospital.
 
 
 56
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 Ratino's practice, at the time of the events alleged in his complaint, was primarily in Montgomery County, Maryland
 
 
 [2]
 Blue Shield operates in the metropolitan Washington area, including Montgomery and Prince George's Counties in Maryland
 
 
 [3]
 The individuals are participating physicians in the Blue Shield insurance plan which Ratino challenges, and practiced in and around Montgomery County, Maryland. They held various positions in MCMS, Holy Cross Hospital and other area hospitals
 
 
 [4]
 15 U.S.C. Secs. 1, 2
 
 
 [5]
 Ratino further alleges that the defendants sought to enforce the fixed prices through intimidation and "boycott" of his services, and that Blue Shield unlawfully used its "monopoly power" to force area physicians to conform to the set prices
 
 
 [6]
 Md.Com.Law Code Ann. Sec. 11-201 et seq
 
 
 [7]
 Ratino sought injunctive relief and money damages
 
 
 [8]
 15 U.S.C. Sec. 1012
 
 
 [9]
 Blue Shield is not named as a party to this alleged conspiracy
 
 
 [10]
 Doctors Wise and Jones, as members of the Professional Relations Committee of MCMS, met with Ratino in January, 1976, to discuss the complaints, and to ask him to cease using the consent forms in emergency rooms
 
 
 [11]
 Ratino also alleged that several of the physician defendants, as members of various area hospital executive committees, deprived him of certain hospital privileges because of his use of the consent form
 
 
 [12]
 Holy Cross Hospital is not named as a defendant to this alleged conspiracy
 
 
 [13]
 Blue Shield distributes promotional literature describing these advantages of the UCR plan
 
 
 [14]
 For example, hemorrhaging during a normally routine operation, or infection following an operation
 
 
 [15]
 Blue Shield representatives attend the peer review meetings, but apparently do not actively participate in decision-making
 
 
 [16]
 Ratino alleges that the committee routinely approves as reasonable the amounts suggested by Blue Shield representatives. Blue Shield disputes this claim
 
 
 [17]
 By way of illustration, assume a physician performs a tonsillectomy on a policyholder. If the 90th percentile of all fees submitted for usual tonsillectomies is $300, that amount would be the "customary fee." If this physician would normally only charge $250 for the operation, that is the amount he should charge. If he usually charges $350 for a tonsillectomy, Blue Shield will only pay $300 unless the physician can show special circumstances. If he is a participating physician, absent special circumstances he must accept the $300 in full payment for his services. A nonparticipating physician may collect the difference from the patient. After Blue Shield has reviewed any special circumstances, it may find the fee reasonable and pay the full amount. If it finds the fee unreasonable, the dispute may be brought before a peer review committee, which then finally decides what amount Blue Shield should pay
 
 
 [18]
 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943)
 
 
 [19]
 The Act provides in relevant part:
 (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such businesses.
 (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, ... unless such Act specifically relates to the business of insurance....
 ....
 (b) Nothing contained in this chapter shall render the ... Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.
 15 U.S.C. Secs. 1012(a)-(b), 1013(b).
 
 
 [20]
 The district court further found the two other requirements of the exemption satisfied: (1) that there was state regulation; and (2) that there was no boycott, coercion, or intimidation. See Pireno, --- U.S. at ----, 102 S.Ct. at 3010, 73 L.Ed.2d at 653
 
 
 [21]
 Indeed, the Supreme Court noted in a footnote that Pireno and Bartholomew were factually identical cases. Pireno, --- U.S. at ---- - ---- n. 6, 102 S.Ct. at 3006-3007 n. 6, 73 L.Ed.2d at 653-54 n. 6
 
 
 [22]
 In Corey v. Look, 641 F.2d 32 (1st Cir.1981), the court said that, where explicit statutory language is absent, an entity claiming the state action exemption must "illustrate the requisite state legislative intent by demonstrating by convincing reasoning that the challenged restraint is necessary to the successful operation of the legislative scheme that the state sovereign has established." Id. at 37
 
 
 [23]
 The Supreme Court has counseled that summary judgment in antitrust litigation should be used sparingly. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). This is particularly true in a rule of reason case. The question of whether a restraint promotes or suppresses competition is not one that can typically be resolved through summary proceedings. National Society of Professional Engineers v. United States, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). Rather, resolution must await a full-developed trial record. This is also particularly applicable in cases of novel antitrust claims. White Motor Co. v. United States, 372 U.S. 253, 261-64, 83 S.Ct. 696, 700-02, 9 L.Ed.2d 738 (1963)
 
 
 [24]
 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." ... 15 U.S.C. Sec. 1
 
 
 [25]
 The Foundation was a non-profit corporation composed of licensed physicians engaged in private practice in Maricopa County. It was organized for the purpose of promoting fee-for-service medicine, and to provide a competitive alternative to existing health insurance plans in the community. The participating physicians had no financial interest in the operation of the foundation. A second foundation also was involved in the case, which for purposes of the litigation was treated the same as the Maricopa County foundation
 
 
 [26]
 Justice Stevens in Maricopa indicated that it is an open question whether the Blue Shield system, operating even as it portends, is free from antitrust attack, 457 U.S. at 352 n. 26, 102 S.Ct. at 2477 n. 26, 73 L.Ed.2d at 64 n. 26
 
 
 [27]
 The Supreme Court has noted that recent studies have concluded that physicians and other health-care providers typically dominate the boards of Blue Shield plans. See Maricopa, 457 U.S. at 352 n. 26, 102 S.Ct. at 2477 n. 26, 73 L.Ed.2d at 64 n. 26; Royal Drug, 440 U.S. at 237 n. 4, 99 S.Ct. at 1086 n. 4. See also Sausalito Pharmacy v. Blue Shield of California, 544 F.Supp. 230 (N.D.Calif.1981)
 
 
 [28]
 The Supreme Court, in FTC v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1009 (1948) stated: "It is enough to warrant a finding of a combination in violation of the Sherman Act if there is evidence that persons, with knowledge that concerted action was contemplated and invited, give adherence to and participate in a scheme." Id. at 716 n. 17, 68 S.Ct. at 811 n. 17. Mere proof of analogous business conduct, however, does not by itself generally support an inference of conspiracy. Such an inference is appropriate only where the actions taken are in apparent contradiction to the party's economic self-interest or where there are circumstances which logically suggest joint agreement, as distinguished from joint action." See Independent Ironworks, Inc. v. United States Steel Corp., 322 F.2d 656, 661 (9th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963)
 
 
 [29]
 Ratino alleged that the defendants engaged in a per se illegal group boycott. While we did not discuss that allegation in the previous section, Ratino should be permitted to develop that theory at trial