John G. ADDINO, D.P.M., Edward J. Bonavilla, D.P.M., David Chazin, D.P.M., Charles F. Coyle, D.P.M., and Louis J. Giordano, D.P.M., Individually and on behalf of all other doctors of Podiatric Medicine having Participant contracts with Genesee Valley Medical Care (A Blue Shield Plan), Plaintiffs,

v.

GENESEE VALLEY MEDICAL CARE, INC., a New York non-profit corporation and Blue Shield Plan, Defendant.

No. CIV 82–45T.

United States District Court,
W.D. New York.

Aug. 31, 1984.

A. Vincent Buzard, Rochester, N.Y., Mark E. Schlussel, Douglas E. Busbey, Schlussel, Lifton, Simon, Rands, Daufman, Lesinski & Jackier, Southfield, Mich., for plaintiffs.

Paul R. Braunsdorf, and Kevin J. Arquit, Harris, Beach, Wilcox, Rubin & Levey, Rochester, N.Y., for defendant.

## MEMORANDUM DECISION AND ORDER

TELESCA, District Judge.

### INTRODUCTION AND PROCEDURAL HISTORY

Plaintiffs, five podiatrists, bring this action against Defendant, a Blue Shield plan, alleging violations of Sections 1 and 2 of the Sherman Act, (15 U.S.C. Sections 1 and 2), in addition to a pendent state law claim. Plaintiffs' original complaint was dismissed by decision and order of this court dated November 3, 1983, on the ground that it failed to sufficiently allege an impact upon interstate commerce caused by defendant's alleged unlawful activities. Plaintiffs filed an amended complaint on November 29, 1983, and now move for partial summary judgment on the issue of defendant's liability under the Section 1 Sherman Act count of the amended complaint. Defendant cross-moved for summary judgment seeking dismissal of the entire complaint. Both motions are now before this Court for determination.

### FACTS [1]

Plaintiffs are licensed podiatrists practicing in the Rochester, New York area. Defendant, Genesee Valley Medical Care, Inc.

---

1. Pursuant to local rule, each party submitted a statement of material facts which were not in dispute, and the following synopsis is distilled from those statements. All facts recited are undisputed unless otherwise indicated.

("GVMC") is a not-for-profit New York Corporation which operates a Blue Shield Plan in a five-county area surrounding the City of Rochester, New York. The plan has approximately 740,000 subscribers which accounts for approximately 74% of the commercial health care delivery market in that area.[2] As of April 1, 1982, GMVC had contracts with 1,333 participating physicians, i.e., doctors of medicine ("M.D.s") who, under the corporation's bylaws, are considered "Members".[3] Podiatrists and dentists are also permitted to contract with GVMC but unless they are elected to the board, they are merely considered "Participants"[4] and not "Members".

A participant in the plan, (an M.D., Dentist or Podiatrist), who signs a contract with GVMC, agrees to accept the maximum fee set by GVMC for a given procedure for treatment provided to one of the plan's subscribers. Under this arrangement, a participant is directly reimbursed by GVMC for services rendered.

An individual subscriber is free to seek treatment from a non-participating provider with several significant consequences. First, the subscriber must make payment to the provider and then seek reimbursement from GVMC. Additionally, if the provider charges more than GMVC's maximum rate for a given procedure, the subscriber will not be reimbursed for this additional amount. With this in mind, it is not difficult to accept plaintiffs' premise that most subscribers, if they have the choice, will seek out only participating providers.

GVMC uses a two-tiered approach for setting the maximum reimbursement rate for a given procedure. The Medical Advisory Committee ("MAC") is the first body to review suggested rate changes. The MAC is made up of eleven M.D.'s and three non-health care providers (referred to as laypersons). The content of the MAC according to the by-laws, is left to the discretion of the board. (See GVMC By-laws Article VII, Section 1)

Prior to the commencement of this action and up until some point afterwards, a Schedule Review Committee was also involved in rate setting. This committee was entirely composed of MD's and performed a reviewing function of the proposals already approved by the MAC. At present, the functions of the Schedule Review Committee are also performed by the MAC, and the former has been eliminated.

Under either system, all proposed rates must be approved by GVMC's board of directors. The present number of directors on the board is 24, being composed of 12 MD's and 12 laypersons. However, the by-laws simply provide that the board may contain no less than 6 nor more than 24 directors, one-half of which must be participants. (See GVMC's By-Laws Article VI, Section 1). Although Podiatrists and Dentists are permitted to serve as board members, no Podiatrist or Dentist has *ever* been chosen or served in that capacity.

The board is elected as follows. The old board determines how many vacancies (both layperson and participant) which need to be filled in a given year. The board then appoints a nominating committee of five persons, at least two of which must be layperson board members. According to plaintiffs, the other three have always been MD's.

After a slate of participant candidates has been presented by the nominating committee, the 1,333 MD members of the corporation (and presumably the 12 layperson board members) elect the participant board members. Thereafter, there is some dispute as to how the 12 layperson members are selected. The plaintiff contends that

---

**2.** Plaintiffs contend that GVMC's market share is 86%.

**3.** Article 3, Section 1 of the GVMC bylaws states: "The membership of the corporation shall consist of (a) those physicians who are Participants in the plan and (b) duly elected directors so long as they shall remain in office."

**4.** Article 4 Section 1 of GVMC's bylaws states: "The term 'Participants' is defined as a duly licensed physician, dentist or podiatrist who is a party to a contract with the corporation, executed pursuant to this article."

the doctor members of the board will control both the selection and appointment of the lay members which is indicative of the measure control enjoyed by the MD's.[5]

The gravamen of plaintiffs' complaint is that GVMC constitutes a structural price fixing conspiracy controlled by MD's. Plaintiffs allege that this conspiracy resulted in the simultaneous reduction of the maximum reimbursement rates for seven podiatric procedures and increases in rates for procedures performed exclusively by MD's. They further allege that this case presents a *per se* violation of Section 1 of the Sherman Act.

## DISCUSSION

## I. SECTION 1, SHERMAN ACT CLAIM

■ Section 1 of the Sherman Act provides that "every contract, combination ... or conspiracy, in restraint of trade or commerce among the several states ... is declared to be illegal ...". 15 U.S.C. 1. Long ago, however, the Supreme Court recognized that Congress could not have intended the word "every" to be taken literally, and most alleged restraints have been judged under what is called the "rule of reason." *United States v. Joint Traffic Assn.*, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898), *Standard Oil of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). The "rule of reason" requires that the fact finder determine, under all of the circumstances, whether the restrictive practice imposes an unreasonable restraint upon competition.

Plaintiffs urge, however, that the rule of reason is inapplicable in this case and that the current state of the law is found in *Arizona v. Maricopa Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). That case held that where doctors established the maximum fees to be paid in full payment for health services provided to patients who were members of a health insurance plan, such an arrangement constituted *per se* illegal price fixing under Section 1 of the Sherman Act. Plaintiff urges that where a price fixing agreement is involved, there is no need for this Court decide whether under all the circumstances the restrictive practice imposes an unreasonable restraint on competition. It is the *per se* rule against price fixing applied in *Maricopa* which plaintiffs assert should also be applied in this case. Plaintiffs argue vigorously that the by-laws of GVMC provide the MD's with the power to control the corporation and therefore to make decisions concerning the pricing of their services rendered to approximately 74% of the community. This argument, they claim, is a logical extension of the *Maricopa* decision.

## A. APPLICATION OF THE ANTI-TRUST LAWS

Before resolving the merits of plaintiff's motion, defendant has alleged in its cross motion that it is exempt from the anti-trust

---

5. Article 6 of the GVMC By-laws provides the particulars of the board election procedure. Participant board members are elected by vote of the membership at the annual meeting (Section 4). Section 5 of Article 6 provides as follows: "Laymen. In each year on or before a date to be set by the Executive Committee, the Nominating Committee shall submit to the Board of Directors, a list of laymen nominated by such committee for election to the Board. Such lists may contain more than one name for each place which the Board shall have advised the Committee is to be filled by a layman. At the first meeting of the board of directors held after the annual meeting of the corporation in each year, the Board shall elect from such list the laymen to fill such places."

Thus, for example, if four participants, and four lay persons are to be elected in a given year, the four participants are selected at the annual meeting and presumably assume their seat on the board for the first meeting thereafter. At that first meeting, the four lay person members would be elected. Under the wording of this By-law, it would appear that the four outgoing lay person members of the board would not have the power to vote since their term has already expired. Thus, under this scenario, twelve participants (M.D.s) and eight lay persons would vote to elect the four new lay person members. Defendant contends, however, that in practice the old layperson members do vote and thus the equal ratio of MDs to laypersons is preserved, negating any alleged control by the MDs.

laws under the "state action" doctrine. *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Defendant alleges that it is pervasively regulated by the New York State Insurance Department and is therefore exempt from anti-trust analysis.[6]

The decisions since *Parker v. Brown* establish a two-pronged test for anti-trust law immunity under the state action doctrine: (1) The challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; and, (2) the policy must be "actively supervised by the state itself." *City of Lafayette v. Louisiana Power and Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978); *California Liquor Dealers v. Midcal Aluminum,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). As the court noted in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), in order to qualify for the state action exemption, it is not enough that anti-competitive conduct is "prompted by state action, rather, anti-competitive activities must be *compelled* by direction of the state acting as a sovereign." Id. at 791 (emphasis added).

In the present case, none of the alleged activities of defendant or its member physicians satisfy the test set forth in *Lafayette.* It cannot be seriously argued that the State of New York *compels* defendants to set rates utilizing this particular method. *See Ratino v. Medical Service of District of Columbia,* 718 F.2d 1260,

1268 (4th Cir.1983). Nor can it be argued that New York State law does anything more than *permit* the present makeup of the GVMC board. Accordingly, the *Parker v. Brown* "state action" exemption is inapplicable to the case before this court.

## B. APPLICATION OF THE PER SE RULE TO THIS CASE

Turning to plaintiffs' principal claim, it is alleged that the corporate structure of GVMC and the method it uses to set reimbursement rates presents a "structural conspiracy" among physicians to fix prices equivalent to the one found in *Maricopa.*[7] Plaintiffs argue that only MDs are permitted to be members of the corporation under the by-laws, MDs comprise a super majority of the Medical Advisory Committee which recommends rate changes (11 MDs to 3 laypersons) and that the board is controlled by MDs.

GVMC argues in defense that no conspiracy has been shown, nor can one be established because it cannot conspire with itself. *See Smith v. Northern Michigan Hospitals, Inc.,* 703 F.2d 942, 950 (6th Cir. 1983). This argument, however, ignores the basic allegations of the complaint. Plaintiffs allege that defendant is merely a vehicle for the member MDs to fix prices charged by those MDs as well as other health care providers. As the court stated in *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia,* 624 F.2d 476, 481 (4th Cir.1980):

**6.** GVMC is required to file its premium rates with the Insurance Department, New York State Insurance Law Section 221, and gain the Department's approval of subscriber contracts. New York State Insurance Law Section 255. Additionally, defendant claims that the makeup of its board is specified by New York insurance law section 250(1)(b) which provides that up to fifty percent of the board may be composed of medical providers.

**7.** In *Maricopa,* the State of Arizona sued two medical foundations alleging that they were engaged in an illegal price fixing conspiracy. The defendant, Maricopa foundation, was comprised of 1750 physicians or approximately 70 percent of all physicians practicing in Maricopa County.

The foundation performed various functions for several designated insurance companies in the area. Of chief importance was the foundation's practice of establishing, by majority vote of its member physicians, a schedule of maximum fees which a member physician would agree to accept as payment in full for a given procedure performed upon one of these company's insureds.

The Supreme Court held that the plaintiff's summary judgment motion on the issue of liability should have been granted by the district court. The Court held that the agreement between competing physicians to accept certain maximum fees was a *per se* violation of Section 1 of the Sherman Act.

"It is not sufficient to assert, as defendants do, that a corporation cannot conspire with itself. We must look at substance rather than form ... Anti-trust law has always been sensitive to the realities of the marketplace and has been particularly watchful of organizations of various trades or professions. [citations omitted]

We think the uncontradicted evidence and the district court findings show sufficient physician control of Blue Shield of Richmond to bring its actions within the purview of Section I of the Sherman Act."

In the present case, plaintiff's allegations are more than sufficient to state a claim of conspiracy between and among GVMC's physician members.

Defendant also argues that the affidavit of several board members submitted in support of its cross motion establish that the rate increases requested by the Medical Advisory Committee are often rejected by the board. Thus, it argues that a conspiracy cannot be proven. *See Virginia Academy, supra,* 624 F.2d at 483. (which held that although the Neurological Society of Virginia cooperated very closely with one of the defendant Blue Shield plans, many of the group's recommendations were rejected by the plan. Thus, a conspiracy between the two was not established.)

Moreover, according to GVMC MD control over the corporation is impossible because 50 percent of the board, which must approve all rates, is composed of non-MDs.

Defendant argues that the layperson board members, many of whom are employed by the largest employers in the area, are vitally interested in defendant's rate structure, and their presence on the board insulates GVMC from any analogy to the *Maricopa* physicians' pricefixing agreements.

In *Maricopa,* the court held that price fixing by physicians, regardless of the potential or actual benefit to the consumer, was *per se* illegal under the Sherman Act. But neither side in this case quarrels with this premise. The crux of the issue presented here is whether the *power* to fix prices deserves the same *per se* treatment as price fixing in fact. Defendant argues that the issue of control by the physicians over GVMC and whether prices have actually been fixed, are questions of fact which cannot be resolved on this motion. Plaintiffs assert, however, that the reasoning applied in *Maricopa* is equally applicable here and that *actual* day to day control need not be specifically established once the *power to control* is.[8]

Defendant argues that a similar "structural conspiracy" argument was rejected in *Pa. Dental Ass'n. v. Medical Service Association of Pennsylvania,* 574 F.Supp. 457 (M.D.Pa., 1983), aff'd without opinion, 722 F.2d 731 (3d Cir.1983). In that case a group of dentists alleged that a Blue Shield plan was involved in price fixing and group boycott in violation of Section 1 through the use of the "usual, customary, and reasonable" (UCR)[9] method of reimbursement

---

**8.** In *United States v. Trenton Potteries,* 273 U.S. 392, 398, 47 S.Ct. 377, 379, 71 L.Ed. 700 the Court held: "The *power* to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. Agreements which *create such potential power* may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable when fixed. ..."

Id. at 397–398, 47 S.Ct. at 379. [emphasis added]

**9.** In Pa. Dental Ass'n., the following definition was given for the UCR charges: "The basic rule is that a dentist is reimbursed his 'usual' charge for a given dental service. The dentist's usual charge is his most frequent charge for that service. However, Blue Shield has calculated a 'customary' charge for each dental service, that being the ninetieth percentile of all 'usual' charges for all dentists throughout Pennsylvania who practice the same specialty. Blue Shield will not ordinarily reimburse a dentist more than the 'customary' charge. ... A dentist may be reimbursed more than the customary charge upon a demonstration of special circumstances relating to the particular service provided. We

for services rendered by dentists to insureds under the plan. The plaintiff dentists alleged that the use of the UCR method constituted price fixing and also illegally coerced dentists into accepting UCR amounts as total payment and into joining the plan or face the loss of their patients.

*Pa. Dental Ass'n.* is easily distinguished from the instant case. While the board in *Pa. Dental Ass'n.* was composed of 16 laypersons and 16 doctors (two of whom were dentists), the same ratio as in this case, the court did not discuss how the 16 layperson board members were elected. The method of election of non-medical board members is vital in the present case. As an example, in the instant case, any board member must first be nominated by the nominating committee which consists of three MDs and two laypersons. Thus, the medical majority on the nominating committee has the potential to control who will be presented for membership as a lay member. It is relevant to point out here that the rates to be paid under the plan to the participants and to the members are established by the medical advisory committee which is composed of eleven MDs

and three lay people. The overwhelming majority membership of MDs on the medical advisory committee is telling.

Further, in the present case defendant controls 74% of the local market, a vast distinction from the 9% market position of the defendant in *Pa. Dental Ass'n.* And finally, in the instant case, only MDs can be members of the corporation and are permitted to vote. Such a structural distinction was not present in *Pa. Dental Ass'n.* since dentists were not only allowed to vote but held two board seats.

In the alternative, defendant argues that the *per se* rule cannot be applied at this stage of the proceedings for even if structural control is granted in the by-laws, plaintiffs must prove that MDs assert actual control over GVMC and conspire to fix prices. Defendant points to *St. Bernard General Hospital v. Hospital Service Ass'n,* 712 F.2d 978 (5th Cir.1983),[10] *Glen Eden Hospital, Inc., v. Blue Cross and Shield of Michigan,* 555 F.Supp. 337 (E.D. Mich.1983); aff'd in part, rev'd in part, 740 F.2d 423 (6th Cir.1984),[11] and *Ratino v.*

---

believe this to be the 'reasonable' element of the UCR feature." 574 F.Supp. at 462.

**10.** In *St. Bernard,* the court reversed a district court dismissal after the close of plaintiff's proof at trial pursuant to F.R.Civ.P. 41(b), and remanded the case for further proceedings. This case involved a private (for profit) hospital which challenged the structural legality of a local Blue Cross plan. The Blue Cross plan at issue provided nine "participating" hospitals with a higher rate of reimbursement than the rate paid to "contracting" hospitals, such as St. Bernard. The defendant had also denied St. Bernard "participating" status. The Board of Directors of the Blue Cross plan in St. Bernard was comprised of eighteen persons appointed by the nine participating hospitals (two each) and thirteen at large members who were elected by the eighteen hospital appointees.

The Court held that the plaintiff had made a *prima facie* showing of a *per se* price fixing violation. It also held that *Maricopa* was not controlling over the outcome of the case due to two distinguishing factors. First, the *St. Bernard* Court held that *Maricopa* involved only a horizontal combination between physicians, whereas the *St. Bernard* plaintiff did not allege a strictly horizontal restraint, but the allegations included a "vertical link from supplier to cus-

tomer." Id. at 986. "These charges", concluded the court, "are not so clearly *per se* violations of the anti-trust laws." Id.

The second distinction that the court found between *Maricopa* and the alleged restraint in *St. Bernard,* was that *Maricopa* involved price fixing only between its own members, whereas the charges by St. Bernard were that the participating hospitals were fixing prices only as to others. While in one sense the court found this to be merely an individual board's announcement of the terms on which it will deal, in another sense it perceived a more egregious scheme of anti-competitive behavior than even *Maricopa,* because under this scheme a burden was imposed upon outsiders but not insiders who create the rules. Id. at 986, 987.

**11.** In *Glen Eden,* a private psychiatric hospital sued the local Blue Cross Plan claiming that the plan engaged in anti-competitive price fixing on behalf of its member hospitals (called "participating" hospitals) by discriminating against non-members such as plaintiff. The defendant in *Glen Eden* had a three-tiered reimbursement rate setting mechanism. First, a reimbursement committee comprised of five consumer members appointed by the Board of Directors, five members appointed by the Michigan Hospital Association and one member each appointed

*Medical Service of the District of Columbia*, 718 F.2d 1260 (4th Cir.1983) [12] in contending that although summary judgment which had been granted to the defendants in these cases was reversed on appeal, the circuit courts failed to enter summary judgment in favor the plaintiffs. Again, however, the structure of the defendant in each of those cases was different than the structure of GVMC.

In *Glen Eden*, the participating hospitals possessed a veto power over changes in reimbursement rates, but no arguable outright control over the decision making process. Thus, to establish a *per se* violation, the plaintiffs in *Glen Eden* were put to the additional task of establishing "collaboration between the participating hospitals and Blue Cross on the decision[s]" ... plaintiffs contended constituted anti-competitive conduct. *Glen Eden, supra,* 740 F.2d at p. 431.

In *Ratino*, the district court did not face the structural conspiracy question because it dismissed the plaintiff's complaint under the "business of insurance" exception to the anti-trust laws. 718 F.2d at 1268. Thus, the Fourth Circuit remanded the case

for a full development of the issues. Id. The Court went on to state: "If the district court finds that in effect physicians control the customary fee, under *Maricopa* it must find such practice *per se* illegal." at 1271. Because the "structural conspiracy" issue was not fully developed at the time the circuit court reviewed the case, its failure to grant summary judgment to the plaintiff is not controlling over this court's decision on that issue.

The *St. Bernard* case presents the most analogous situation to the present case and thus the most compelling authority for defendant's proposition that plaintiffs must prove actual control. As discussed previously, the *St. Bernard* court held that *Maricopa* was not controlling due to two dissimilarities of fact, first that there was an element of vertical price fixing involved which was not present in *Maricopa*, and second, the defendants in *St. Bernard* sought to fix prices only as to others and not as to themselves. 712 F.2d at 986, 987.

As for the first dissimilarity found by the court in *St. Bernard*, this court must disagree with the significance of the distinc-

by the Governor of Michigan, and the leaders of both houses of the state legislature, made recommendations to the board. Eight of the committee's thirteen members were required to approve any change in reimbursement policy. The board, which consisted of twenty-seven consumer representatives, 19 provider representatives and the president of Blue Cross, would then approve or reject the proposed change. Finally, two thirds of the participating hospitals would have to ratify any changes in reimbursement policy. The plaintiff alleged that this veto power constituted control by the participating hospitals and amounted to price fixing. The district court held that the ability of participating hospitals to prevent changes in the plan, without more, did not demonstrate concerted action in restraint of trade and granted defendant's motion for summary judgment.

On appeal, the Sixth Circuit reversed the district court's dismissal of the plaintiff's section 1 claim. In so doing, the Court provided the following direction to the district court: "[I]f Glen Eden is able to demonstrate control by other hospitals over the reimbursement payments Blue Cross is willing to offer it, the necessary agreement or conspiracy to fix prices of a competitor will be established. As the court pointed out in *Maricopa County*, price fixing is

unlawful per se and it is wrong for a court to inquire into the reasonableness of fixed prices. 457 U.S. at 350, 102 S.Ct. at 2476." Id. 740 F.2d at p. 430.

**12.** In *Ratino*, a plastic surgeon sued a Blue Shield plan alleging, *inter alia*, that Blue Shield's UCR insurance plan which involved provider agreements with physicians and a peer review mechanism, constituted an illegal price fixing agreement in violation of Section 1 of the Sherman Act. As in all of the plans discussed, a participating physician agreed to accept the UCR rate as full payment for services rendered while nonparticipating physicians could get no direct reimbursement from Blue Shield. The district court held that the challenged activities were exempt from the anti-trust laws because they constituted the "business of insurance" under the McCarran-Ferguson Act, 15 U.S.C. Section 1012(a, b), 1013(b). The Fourth Circuit, relying upon *Union Labor Life Insurance Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), reversed and remanded the case for further proceedings on plaintiff's section 1 claim. The Court did state that "[i]f the district court finds that in effect the physicians control the customary fee, under *Maricopa*, it must find such practice per se illegal." Id. at 1271.

tion, at least as it applies in the present case. In *Maricopa*, the agreement reached between the competing physicians as to the rates charged for a given procedure, were of no effect without the insurance companies and their customers who were the beneficiaries of those agreements. So too in the present case where prices are being fixed through the vehicle of an insurance plan which is alleged to be controlled by physicians. These agreements only bear fruit when the insureds seek medical services from participating physicians. The *St. Bernard* court found this to be a vertical link from supplier to customer, 712 F.2d at 986. However, this court fails to see how such a vertical link makes the structure in this case significantly different from the scheme found to be illegal in *Maricopa*.

Thus, this court does not find the reasoning of the Fifth Circuit in *St. Bernard* to be controlling under the facts of the present case. Moreover, the court in *St. Bernard* prefaced its entire discussion by acknowledging that "[t]he question before us is not whether there was either in fact or in law an actual violation of the antitrust laws." 712 F.2d at 983. With this in mind, the Fifth Circuit's failure to grant summary judgment to the plaintiff is not persuasive authority that it could not have done so, and further, that it shouldn't be granted here.

▮ In summary, the leading cases decided since *Maricopa* involving allegations of price fixing by Blue Cross/Blue Shield plans, do not present identical or even substantially similar corporate structures to the one found in this case. Therefore, this court must apply general *per se* principles to the unique facts alleged herein. After reviewing these principles as set forth in *Maricopa*, as well as those established by the Supreme Court in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), and the

other Supreme Court cases applying the *per se* rule against price fixing agreements, the arguments in favor of applying a *per se* rule to a case such as this outweigh those against. Just as the *per se* rule has been utilized to eliminate the "necessity of minute inquiry whether a particular price was reasonable or unreasonable as fixed" and to "eliminate the burden of ascertaining from day to day whether it has become unreasonable through the mere variation of economic conditions ...", *United States v. Trenton Potteries*, 273 U.S. 392, 398, 47 S.Ct. 377, 379, 71 L.Ed. 700, so too, the *per se* rule should be applicable to eliminate the necessity, once the *power* to illegally fix prices is established, of ascertaining from day to day whether that power is being utilized. Accordingly, this court will apply the *per se* rule and if under the present corporate structure MDs enjoy the power to fix prices, that structure is illegal under Section 1 of the Sherman Act.

An analysis of the corporate structure of GVMC clearly points out that the medical doctors have the potential to fix the rates that are to be paid to members and participants for medical services rendered. Significantly, only MDs are permitted to be members of GVMC. Both podiatrists and dentists (as well as all other types of non-MD health care providers) are clearly excluded from membership.[13] The board of directors consists of 24 members; 12 medical doctors and 12 laypersons. The nominating committee which selects participant and layperson candidates for the board is made up of three medical doctors and two laypersons (the laypersons being current members of the board). The medical advisory committee which recommends the rates to be charged for the various medical procedures covered by the plan is composed of 11 medical doctors and 3 laypersons.

Defendant argues that the presence of responsible laypersons on the board, (which

---

**13.** GVMC has recently (August 28, 1984) voted to amend its by-laws to allow podiatrists and dentists to become members of the corporation. In order to become effective, such a change must be approved again at the next meeting of the board of directors. However, even if this change is approved, GVMC's structure will not be sufficiently altered to distinguish this case from *Maricopa*.

is clearly established by the affidavits submitted), is persuasive proof that absolute control to establish rates is not solely within the power of the medical doctor members. However, the structure of the corporation makes this alleged safeguard illusory since the built-in majority in the two critical committees (nominating committee and medical advisory committee) insure a medical bias as to rates, membership, and composition of the board of directors. If the composition of these committees were in reverse a much different case would be presented.

■ The inescapable conclusion is that under the GVMC by-laws, MDs have the power to control the rate setting mechanism. Thus, these by-laws are per se illegal under *Maricopa*. Accordingly, plaintiffs' motion for partial summary judgment on the issue of liability with respect to the first count of the amended complaint is granted.[14]

## II. SECTION 2, SHERMAN ACT CLAIM

Count II of the plaintiff's amended complaint attempts to allege an unlawful attempt to monopolize by GVMC in violation of Section 2 of the Sherman Act. The plaintiff alleges in the amended complaint that GVMC arbitrarily acted to reduce a significant percentage of the maximum amount to be paid for certain podiatric procedures "... at an unreasonably low level so as to retain its monopolistic position in the market as well as its overwhelming competitive advantage over other available forms of pre-paid medical care and to eliminate competition from insureds of pre-paid medical care and services." (Amended complaint, paragraph 52). The plaintiffs further complain that as a result of this,

"... other insurers outside of the State of New York and/or the designated counties are excluded from the market and precluded from any meaningful form of competition with GVMC ...". (Amended complaint paragraph 53)

■ Plaintiff has failed to state a claim in alleging GVMC refused to deal with podiatrists unless they accept "arbitrarily" reduced reimbursement rates. Plaintiffs' complaint does not provide any logical link between GVMC's reduction of podiatric reimbursement rates and GVMC's retention or enhancement of its market power. *Official Airlines Guides, Inc. v. F.T.C.*, 630 F.2d 920 (2d Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981); *see also, United States v. Colgate, Inc. Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

■ And finally, it is extremely doubtful that the plaintiffs have standing to raise these Section II claims since they are not competitors of GVMC in the pre-paid insurance market. See 15 U.S.C. Section 15; *Pa. Dental Ass'n. v. Medical Services Association of Pennsylvania, supra*, 574 F.Supp. at 469.

Accordingly, Count II of the amended complaint fails to state a valid claim upon which relief can be granted and must be dismissed pursuant to F.R.Civ.P. 12(b)(6).

## III. STATE LAW CLAIM

Plaintiff's final claim is that GVMC has breached its duty of good faith to plaintiffs by their reduction of the reimbursement rates for podiatric procedures. Plaintiffs claim that under New York State Corporate Law, GVMC owes a fiduciary duty to its members, even though defendant is a not-for-profit corporation. Plaintiffs have failed to cite any New York authority for

---

**14.** In its motion to dismiss the original complaint, GVMC asserted that plaintiffs had failed to plead a sufficient adverse effect on interstate commerce to provide this court with subject matter jurisdiction over plaintiff's anti-trust claim. This court agreed and dismissed plaintiff's complaint without prejudice. A review of plaintiff's amended complaint, however, reveals that plaintiffs have now provided sufficient alle-

gations in their pleadings to meet the jurisdictional interstate commerce requirement. *See, Hahn v. Oregon Physicians Service*, 689 F.2d 840 (9th Cir.1982). GVMC is free to challenge the validity of the interstate commerce allegations of the amended complaint in subsequent proceedings before this Court. See *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936).

this dubious proposition, nor has this court been able to find any.

■ It must be remembered that plaintiffs are merely "participants" and not "members" of GVMC under its present by-law structure. This status is contractual in nature. If GVMC has failed to follow the correct reimbursement rate modification procedures contemplated in the contract, plaintiff's remedy is a breach of contract action. Thus, (Count III) of plaintiff's amended complaint fails to state a claim and must be dismissed pursuant to F.R. Civ.P. 12(b)(6).

### IV. CONCLUSION

In summary, this court holds that the present structure of GVMC provides the corporation's physician members with the power to horizontally fix prices among competitors and is thus, *per se*, illegal pursuant to the reasoning set forth in *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). Although this Court recognizes that maximum fee schedules may very well provide a benefit to the community by way of reduced health care costs, it is in no way essential "that the doctors do the price fixing". Id., 457 U.S. at 352, 102 S.Ct. at 2477.

Accordingly, plaintiff's motion for partial summary judgment pursuant to F.R.Civ.P. 56 on the issue of liability in regard to Count I of the plaintiff's amended complaint is granted; Counts II and III of the amended complaint are dismissed pursuant to F.R.Civ.P. 12(b)(6).

ALL OF THE ABOVE IS SO ORDERED.